## In re NEW YORK & W. WATER CO.

### (District Court, S. D. New York. January 8, 1900.)

1. **INVOLUNTARY BANKRUPTCY—CORPORATIONS—WATER COMPANY.**

   A water-supply company, engaged in the business of obtaining, transporting, and supplying pure water for municipal and domestic use, receiving compensation from consumers in the shape of fixed rentals, is not "engaged principally in trading or mercantile pursuits," within the meaning of Bankr. Act 1898, § 4b, although it obtains part of its water supply by purchase, and therefore is not liable to be adjudged bankrupt upon involuntary proceedings against it.

2. **SAME.**

   Although a water company may be authorized by its charter to "buy, sell, use, and deal in water for power, manufacturing, and hydraulic purposes," yet, if its business is actually confined to supplying water for domestic consumption and to municipal fire departments, it cannot be said to be "engaged principally in trading or mercantile pursuits."

3. **SAME—QUASI PUBLIC CORPORATIONS.**

   Semble, a corporation otherwise amenable to the bankruptcy law is not exempted from its operation on the ground of being a quasi public corporation and subserving a public use, if its franchise is assignable, so that its functions might be exercised by any transferee to whom its powers might pass through proceedings in bankruptcy.

In Bankruptcy.

Edward Harding, W. Kintzing Post, and William G. Choate, for petitioning creditors.

William C. Prime and Allan McCulloh, for alleged bankrupt.

BROWN, District Judge. This matter arises upon a petition of various creditors of the New York & Westchester Water Company to have that corporation adjudged a bankrupt, alleging its insolvency and several acts of bankruptcy. The answer to the petition as was ruled upon the hearing of the issue, a jury trial being waived, admitted in effect the insolvency of the corporation, but denied the acts of bankruptcy alleged, and also denied the jurisdiction of the court, on the ground that this corporation is not subject to the provisions of the bankrupt act (section 4b), because not "engaged principally in manufacturing, trading, printing, publishing or mercantile pursuits," as alleged in the petition. The evidence as respects the acts of bankruptcy is somewhat complicated; but from the conclusions I have arrived at on the other branches of the case, it will not be necessary to consider that subject.

The company was incorporated under the Laws of 1873 of the state of New York, for the supply of pure and wholesome water to the village of Westchester and others, under contract with the local authorities. By an amendment of its charter in 1895, its business and powers were extended so as to include the right "to accumulate, conduct, store, furnish, buy, sell, use and deal in water for power, manufacturing and hydraulic purposes." Its water supply was derived mainly from the Hutchinson river in Westchester county and from wells and other sources of supply owned or leased by the company. It had some 80 miles of mains laid in the streets of the several villages supplied with water, and received, both from the public authori-

ties, as well as from private citizens, large rentals for the supply of water distributed for private and public uses. On December 31, 1897, a contract was executed, dated December 2d, with the city of New York, whereby the latter authorized this company to tap the city's Bronx river supply pipe in Yonkers, and to draw therefrom not to exceed 500,000 gallons per day, to be paid for by the corporation at the rate of 10 cents per 1,000 gallons, by assigning to the city authorities "hydrant rentals" to become due from the city for water supplied to it by the company for fire protection in the Twenty-Fourth ward; with the privilege to the company of severing such connection with the supply pipe at pleasure and of discontinuing the taking of water from the city supply, and the privilege of subsequently again making connection and resuming the use of the water, as the company might desire.

For some period preceding the trial, how long does not appear, the company had been drawing from the city's supply at about the average rate allowed of 500,000 gallons per day. This was resorted to, as I infer from the evidence, to insure a uniform distribution to the company's customers, partly in consequence of inefficiency in one of the company's pumps and machinery, and the liability to occasional breakdowns, and partly to insure a full supply.

Although the company, by the amendment to its charter, above referred to, was empowered "to buy and sell water for power, manufacturing and hydraulic purposes," this power does not appear ever to have been used, since it has never supplied, according to the testimony, any water for those purposes, nor done any commercial or mercantile business; "but has confined itself entirely to obtaining and furnishing water for the customers, cities and municipal boroughs mentioned," that is, to the residents of the villages, and to the municipal corporations referred to, for fire purposes and the supply of fire hydrants. At Pelhamville the company had 16 driven wells; and besides the amount drawn from the city's supply pipe, the ordinary consumption from the company's own sources of supply was about 750,000 gallons daily.

I am of opinion that this water company is not within the provisions of the bankrupt act, because not "engaged principally in either trading or mercantile pursuits," in the sense in which I think those words are used. The question depends entirely upon the proper construction to be given to those words, since there are plainly no other words in the present act that could include an incorporated water company like this.

The act of 1898 is much more limited in its application to corporations than the act of 1867. By the latter act it was declared (section 5122, Rev. St.) to "apply to all moneyed, business or commercial corporations and joint stock companies." The present act is restricted to corporations "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits."

The intention of congress greatly to restrict the application of the present act appears manifest, not only from comparison of the phraseology of the two acts, but also from the report of the congressional conference committee upon this point, showing that at

least railroad and transportation corporations and banks were intended to be omitted and left to be dealt with under the state laws. 31 Cong. Rec. p. 6247, June 28, 1898. In the recent case of In re Cameron Town Mut. Fire Lightning & Windstorm Ins. Co. (D. C.) 96 Fed. 756, it was accordingly held, that the present act does not apply to a mutual insurance company, and the petition in that case was dismissed. On the point here considered, Phillips, J., observes:

"Can it be said that a company 'organized for the sole purpose of mutually insuring the property of the members, and for the purpose of paying any loss incurred by any member thereof by assessment,' is principally engaged in a mercantile pursuit? When the legislature changed the statute from 'moneyed, business or commercial corporations' to the language 'principally engaged in mercantile pursuits,' it is to be presumed it was done for a purpose. The word 'mercantile,' in its ordinary acceptation, pertains to the business of merchants, and has 'to do with trade, or the buying and selling of commodities.' A merchant is one who trades, or who buys and sells goods or commodities. * * * The term 'mercantile pursuit' necessarily carries with it the idea of traffic, the buying of something from another or the selling of something to another, and is allied to trade. This concern has nothing in its business of the character of mercantile pursuit." 96 Fed. 757, 758.

The case of a water company like this, obtaining by purchase about two-fifths of the supply which it furnishes to its customers, is not so clearly excluded as a mutual insurance company. But in each case as it arises the limitations imposed by the act must be carefully observed. No such corporation can be subjected to the operation of the bankrupt law, nor can the court acquire jurisdiction over it, unless it is found to be "engaged principally in trading or mercantile pursuits." These words must be interpreted in the sense in which they are commonly used and received, and not in any strained or unnatural sense for the purpose of including or of excluding particular corporations.

In Bom. Law Dict. a trader is defined as "one who makes it his business to buy merchandise or goods and chattels and to sell the same for the purpose of making a profit." Black, Law Dict., says: "One whose business is to buy and sell merchandise or any class of goods deriving a profit from his dealings;" and the weight of authority seems to be, that the proper description of the business of a trader includes both buying and selling, either goods or merchandise, or other goods ordinarily the subject of traffic. Per Lord Ellenborough, in Sutton v. Weeley, 7 East, 442; Thompson, C. J., in Wakeman v. Hoyt, 28 Fed. Cas. 1351; Lowell, J., in Re Chandler, 4 N. B. R. 213, 5 Fed. Cas. 447; In re Smith, 2 Low. 69, 22 Fed. Cas. 395; Love v. Love, 15 Fed. Cas. 999.

The words "mercantile pursuits" may have a little broader signification than "trading." "Mercantile" is defined by the Century Dictionary as "having to do with trade or commerce; of or pertaining to merchants, or the traffic carried on by merchants; trading; commercial." It signifies for the most part the same thing as the word "trading"; and by "mercantile pursuits" is meant the buying and selling of goods or merchandise or dealing in the purchase and sale of commodities, and that too not occasionally or incidentally, but habitually as a business. Norris v. Com., 27 Pa. St. 494; Com. v. Natural Gas Co., 32 Pittsb. Leg. J. 310.

Selling merely the natural products of one's own land, it has been held, does not constitute trading, or a mercantile pursuit, even though some yearly purchases may be made by the seller in order to keep up his regular supply. In re Woods, 7 N. B. R. 128, Fed. Cas. No. 17,-990; Port v. Turton, 2 Wils. 169; In re Cleland, 2 Ch. App. 466; Ex parte Gallimore, 2 Rose, 424. These terms are restricted also to dealings in merchandise, goods or chattels, the ordinary subjects of commerce; so that a railroad contractor, or a speculator in stocks, whether on his own account, or as broker, is not deemed a trader or merchant. In re Smith, 2 Low. 69, 22 Fed. Cas. 395; In re Marston, 5 Ben. 313, 16 Fed. Cas. 857; In re Woodward, 8 Ben. 563, 30 Fed. Cas. 542; In re Moss, 19 N. B. R. 132, 17 Fed. Cas. 901, per Choate, J. It has also been held that incidental purchases or sales by a person not otherwise a trader, will not make him such. Lord Eldon, Ex parte Gallimore, 2 Rose, 424; Patten v. Browne, 7 Taunt. 409; In re Duff (D. C.) 4 Fed. 519, per Choate, J.; In re Kimball (C. C.) 7 Fed. 461, per Lowell, J.

No doubt the powers of a corporation are to be determined by its charter and by the statutes applicable to it. The amendment of the charter of this corporation authorized it "to buy, sell, use and deal in water for power, manufacturing and hydraulic purposes." As above stated, however, the evidence is that it did not furnish water for these purposes; and under the bankrupt act the question is, not how extensive the company's powers may be, but in what pursuits the corporation is in fact principally engaged, and whether these pursuits are principally trading or mercantile.

In view of the above definitions and precedents, it seems to me a strained and unnatural use of terms to describe the ordinary business of a water-supply company as a "trading or mercantile pursuit." In common parlance, I think such a business would never be so described; and if only those corporations are subject to the bankrupt act that are engaged in "trading or mercantile pursuits" in the commonly received meaning of those words, I do not see how water-supply companies can fairly be held to be within the act. In the case of First Nat. Bank v. Council Bluffs City Waterworks Co., 56 Hun, 412, 9 N. Y. Supp. 859, the court observes: "This water company was not a trading or banking corporation."

This view is confirmed by observing more particularly the precise nature of such a company's business, its undertaking, its methods and its mode of compensation.

Its business is to obtain pure water, and by means of mains and pipes, to transport it from its sources, often through long distances, under considerable pressure, so as to serve its customers by a running stream at the elevations desired.

Water is a natural product. In its natural condition, it is not usually considered merchandise. At the sources of supply, when the company's plant is once established, the water itself costs little or nothing. In its natural state, it has no commercial value. When bottled or inclosed in casks and put upon the market, it becomes a commodity, and is a subject of trade and commerce in the proper sense. But that is not the business, nor would that meet the re-

quirements, of a water-supply company. Such a company does not sell water as a commodity deliverable from hand to hand in specific quantities, or at any specific price. The characteristic feature of its business, as I have said, is to transport the water as a running stream and in its natural condition, from the sources of supply to the elevations at which it is to be served. Its cost to the company is chiefly the cost of transportation under pressure; and what its customers pay to the company, is not the price of any specific amount of water, as upon a direct sale, but for the use of the company's transportation service, in the form of rentals for the privilege of tapping its mains or pipes and drawing therefrom. The rentals no doubt vary with reference to the number and size of pipes used and the amount of water liable to be drawn; but when fixed, the rentals are payable irrespective of the particular amount drawn, or whether any water is drawn or not.

These circumstances seem wholly to distinguish the business of a water company from a trading or mercantile pursuit, as those words are commonly understood. The leading idea of the company is, not to trade or traffic in water as merchandise, but to transport it under pressure from distant sources to the consumer in the form above stated, renting out privileges to draw from its pipes. This characteristic feature naturally brings such companies within the classification of transportation companies, among which it is recognized and classified by the Laws of New York, in the revision of the laws entitled, "An act in relation to transportation corporations, excepting railroads." Laws 1890, c. 566. This chapter treats of ferry, navigation, stage-coach, tramway, pipe-line, waterworks, gas and electric light, telegraph and telephone, turnpike, plank-road and bridge corporations. This statutory classification is, I think, founded upon the true conception of the main functions of the company, which excludes it from the class of trading or mercantile pursuits intended by the bankrupt act.

The contract with the city by which the company recently secured about two-fifths of the water supplied by it to the different villages and municipal corporations for private and public uses, certainly does not change the essential character of its business, nor make it principally engaged in trading or commercial pursuits. That was but a single contract incidental to the general purpose of the corporation, and to enable it to furnish a regular and unfailing supply through its mains, but terminable at pleasure when its machinery and other sources of supply should be more complete.

Considerable has been said in argument on the question whether water companies like this, incorporated under the act of 1873, are quasi public corporations, exercising in some degree a governmental agency. So far as any such claim might exempt these corporations from taxation, it was rejected by the court of appeals in the Case of the Mills Waterworks Co., 97 N. Y. 97. The language of Danforth, J., in delivering the opinion of the court in that case, seems to deny the exercise by such companies of any public functions whatever, or that the company's means are devoted to any public use, or other than simply to the earning of money for the corporation's own use.

The general language employed seems to go beyond the requirements of the case. It is, however, well settled in other cases that such companies do subserve a public use so far as to justify the exercise of the right of eminent domain; and that the uses they subserve are none the less public, because procured through private enterprise. Water Co. v. Stanley, 39 Hun, 424, 426, affirmed in 103 N. Y. 650; Waterworks Co. v. Bird, 130 N. Y. 249, 259, 29 N. E. 246. And the same view has been frequently expressed in the federal courts. San Diego Land & Town Co. v. City of National City, 174 U. S. 739, 755, 19 Sup. Ct. 804, 43 L. Ed. 1154; New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Mfg. Co., 115 U. S. 650, 669, 6 Sup. Ct. 252, 29 L. Ed. 516; Walla Walla Water Co. v. City of Walla Walla (C. C.) 60 Fed. 957, 960.

I do not attach much importance, however, to any quasi public character, more or less, that water companies may have in consequence of the public uses they subserve. For the franchises of this company, by its contract with the local authorities, are assignable; so that there is nothing to prevent the exercise of its functions by any transferee to whom its powers might pass through bankruptcy proceedings, if lawfully subject to the operation of the bankrupt act. For the reasons previously stated, however, I do not think this company is within the act, and the petition is, therefore, dismissed.