FIRST NAT. BANK OF WILKES BARRE et al. v. WYOMING VALLEY ICE CO.

(District Court, M. D. Pennsylvania. March 17, 1905.)

No. 558.

1.˙ BANKRUPTCY—TRADING CORPORATIONS—ICE COMPANY.

A corporation chartered for the purpose of carrying on a wholesale and retail ice business, and which in fact sold not only ice of its own harvesting, but also large quantities which it purchased from third parties, is engaged chiefly in trading and mercantile pursuits, within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423], and may be adjudged an involuntary bankrupt.

2. SAME—CORPORATIONS—VALIDITY OF BONDS.

The failure of a Pennsylvania corporation to pay the tax due the state on an increased issue of stock, which had been duly reported to the state authorities as required by law, was an irregularity of which advantage could only be taken by the state, which waived its right by subsequently accepting the tax, and the delay in making the payment did not affect the validity of the stock, or of bonds based thereon, which could only be issued under the state law to the amount of half the capital stock, so as to exclude such bonds from consideration in determining the question of the corporation's insolvency in bankruptcy proceedings against it.

3. SAME—INSOLVENCY.

The liability of stockholders of a corporation for stock claimed to have been issued without payment, which claim is disputed, cannot be taken into account as an asset in determining the question of the corporation's solvency in bankruptcy proceedings against it.

4. SAME—GOOD FAITH OF PROCEEDINGS.

Where a corporation is insolvent, and has been forced by reason of its insolvency to commit acts of bankruptcy in failing to vacate executions levied on its property, the fact that directors and stockholders, who are

also creditors, join with other creditors in a petition to have it adjudged a bankrupt in order to secure an equitable distribution of its assets is not an evidence of bad faith or collusion which will avail the execution creditors to defeat the adjudication.

In Bankruptcy. On involuntary petition.

W. S. McLean, for petitioners.

George R. Bedford and W. H. Hines, for contesting creditors.

ARCHBALD, District Judge. These are involuntary proceedings brought against the Wyoming Valley Ice Company, a corporation organized under the laws of Pennsylvania, and having its principal place of business at Wilkes Barre, in this district. No defense is made by the company; but certain execution creditors, who had levied upon and were about to sell its personal property at the hands of the sheriff, which brought about its bankruptcy, appear and contest the validity of the proceedings upon several grounds. In view of the preference secured by virtue of their executions, it is a question whether they are entitled to do this without a surrender. Collier on Bankruptcy (5th Ed.) 229. Contra, In re Moench (D. C.) 10 Am. Bankr. R. 590, 123 Fed. 977. But, passing that by, let us consider the objections that are made.

1. It is charged in the petition, in order to bring the case within the law, that the respondent company is engaged exclusively in trading and mercantile pursuits. Issue is taken as to this in the answer, and the question is whether it is sustained by the proofs. A "trader" is defined as one who is engaged in trade or commerce (28 Am. & Eng. Encycl. Law [2d Ed.] 438); or, more strictly speaking, one who buys and sells goods or merchandise for gain. Collier on Bankruptcy (5th Ed.) 63; Brandenburg (3d Ed.) § 115; Loveland (2d Ed.) 148. A corporation principally engaged in trading, according to the latter view, would therefore be one which bought to sell, and not simply one which sold that which it has produced, supplied, or made. In re New York Water Co. (C. C.) 98 Fed. 711. Having regard to the general purpose of the bankruptcy act [U. S. Comp. St. 1901, p. 3423], a narrow construction is not to be maintained; but, without attempting anything closely accurate, it is sufficient to say that a corporation is within its provisions where it is engaged in a commercial pursuit or business which, if carried on by an individual, would constitute him a "trader" or "dealer," in the ordinary acceptation of that term. In re Tontine Surety Co. (D. C.) 116 Fed. 401.

In the present instance the respondent company was incorporated by a special act of the Pennsylvania Legislature for the purpose of carrying on a wholesale and retail ice business, as its name implies. Act April 15, 1869 (P. L. 1870, p. 1415). It was given the right to take ice from the Susquehanna, Lackawanna, or Lehigh rivers, or any other creek or stream, in the then county of Luzerne, in order to supply its icehouses for the accommodation of the public; and by the extension to it of the privileges possessed by the Cold Spring Ice & Coal Company of Philadelphia, incorporated by Act March 30, 1864 (P. L. 114), it had the further general right of purchasing, conveying, or holding such real and personal estate as might be required for carrying on its

business. Conceding that this of necessity gave it authority to buy and sell or deal in ice, it is contended that the proofs do not show that this was done, but only that it sold to customers the ice which it harvested itself from various fields. This brings it, as it is said, within the Case of New York Water Co. (C. C.) 98 Fed. 711, where it was held that the character of a corporation is to be determined by the business which it actually does, and not simply by that which it is empowered to do. But, without committing myself to the doctrine of that case, it is sufficient to observe that a mistake is made as to the extent to which the evidence goes here. Not only is it established that the company was carrying on the ice business, selling or dealing in ice of its own gathering, whatever the effect of that might be, but it is expressly shown that a material part of that which it disposed of to customers in this way was obtained from third parties, none other in fact than the Bear Creek Ice Company, one of the contesting creditors, and the Pocono Ice Company, with each of whom agreements were proved for the purchase of certain annual minimum quantities, out of which the financial embarrassment of the company largely grows. Whatever view be taken of it, therefore, the law is thus fulfilled. The ice company is a trading corporation in every sense of the word, buying and selling for expected gain, and the objection falls.

2. It is said, however, that, rightly considered, the company is not insolvent. For these two positions are taken: First, that the bonds of the company, which constitute by far the greater part of its indebtedness, and without which it would be undoubtedly solvent, are invalid; and, second, that among the assets of the company the liability of stockholders is to be included to whom stock was given as a bonus upon the purchase of bonds. The following is a comparative statement of liabilities and assets at the time the proceedings were instituted, as given by the president:

### Liabilities.

| | |
|---|---|
| First mortgage bonds.......................................... | $ 90,000 |
| Int. thereon for two years at 6%................................ | 10,800 |
| Floating indebtedness (about)................................... | 3,000 |
| Debts due to petitioning creditors.............................. | 24,000 |
| Judgments of petitioning creditors (say)........................ | 7,000 |
| | $134,800 |

### Assets.

| | |
|---|---|
| Property at corner of Delaware and Jackson streets, Wilkes Barre, one and one-half acres held in fee, improved with icehouses, stables, sheds, offices, etc.................................................. | $ 70,000 |
| Leasehold on west side of Market St. bridge, Dorranceton, improved with two icehouses, small office building, and barn; no value except for old lumber, railroad terminal there having been abandoned ....................................................... | 600 |
| Contracts for two lots in Hanover township, with two icehouses, offices, and barn................................................ | 6,000 |
| Horses, wagons, ice on hand, and personal property generally, outside of book accounts, sold by receiver, and realized............ | 4,250 |
| Collectible accounts (about)..................................... | 900 |
| Money in bank................................................... | 330 |
| | $ 82,080 |

Taking these figures—and we have none others—the liabilities exceed the assets over $50,000. But this depends, of course, on the validity of the bonds, which, with the accrued interest, amount to over $100,000; and their invalidity is asserted on the ground that the company was prohibited, both by its charter and by the general law of the state, from borrowing money upon mortgage to an amount exceeding one-half its capital stock, which at the time, as it is claimed, was but $25,000. Act April 15, 1869, § 2 (P. L. 1870, p. 1415); Act May 21, 1889, § 1 (P. L. 257). But see Act Feb. 9, 1901, § 1 (P. L. 3); Commonwealth v. Buffalo & Susquehanna R. R., 25 Pa. Co. Ct. R. 274. The fact is not ignored that before the bonds in question were issued; on March 16, 1901, steps were taken to increase the capital stock from this, its original amount, to $225,000, of which due return was made to the secretary of the commonwealth, as required by law. Act April 18, 1874, § 7 (P. L. 62); Act Feb. 9, 1901, § 3 (P. L. 5). But the point is made that the tax or bonus due the state upon the increase was not paid at the time as provided by the statute, nor, indeed, till after the proceedings in bankruptcy were instituted, and that the increase, therefore, was illegal. If there was any delinquency of this kind, however, it had no such effect as is claimed for it, going neither to the validity of the increase nor to the bonds which are based upon it. At the most, it was an irregularity, of which the state authorities alone could take advantage (Columbia National Bank's Appeal, 16 Wkly. Notes Cas. 357; Pullman v. Upton, 96 U. S. 328, 24 L. Ed. 818), and they have condoned it by accepting the payment which was recently made.

Neither is anything to be made out, on the other side of the account, of what is claimed to be due from the holders of bonus stock. It is no doubt true that the parties who accepted this stock were well aware of its origin, having assisted as directors in issuing it to Mr. Young, in consideration of the contracts and options which he turned over to the company. But even though this be the case, and although it should be determined in the end that they are severally liable, to the extent of their holdings, as for stock which remains unpaid, the liability amounts to nothing as an asset to be reckoned with at this time. If ever secured, it will only be at the end of a lawsuit, all the parties expressly declaring that they should contest their liability, and no possible value can therefore be ascribed to it here.

3. Finally, the good faith of the proceeding is assailed—a friendly affair, as it is said, in which the directors and stockholders are petitioners, for the purpose of accomplishing indirectly what the company as a corporation could not do for itself, in order to shake off the claims of the contesting creditors. In this connection it is pointed out that Mr. Weigand, the treasurer, admitted having stated that the main reason was to get rid of the Albert Lewis contract, and that Mr. Conyngham, another director, testified that bankruptcy was discussed as the only alternative left, after negotiations with Mr. Lewis for a settlement had failed. The appearance of the First National Bank as a petitioner is explained by the suggestion that Mr. McLean, the president, is also counsel for the ice company, and took action without consulting with the other officers, and without the bank having any interest to sub-

serve, it being abundantly secured on the notes of the ice company which it holds.

But self-interest and bad faith are not to be confounded, and the one is all that we have here. Bankruptcy was a lawful expedient to be resorted to, to secure an equal division of the property, so that the execution creditors who are contesting the proceedings should not get it all. An act of bankruptcy was undoubtedly committed by the failure of the company to vacate the executions on which the property was advertised, and that the company was insolvent has been found. The situation, therefore, was one of the contestants' own making, and not manufactured by the petitioners by virtue of their position, and, existing independently of them, there was nothing in law or morals which prevented them from taking advantage of it, for their own protection, any more than any one else. Having carried the company along as they had, by advancing money and lending their credit, they were not obliged to sit by and do nothing, simply because of their official relation to it. Nor is it admitted that bankruptcy was resorted to to get rid of the claims of the contesting creditors, but only that no other alternative was open to them, the contesting creditors pressing for a settlement by judgment and execution, and all other means of relief having failed. And even if evidence of a sinister purpose in this direction was stronger than it is, without proof of collusion among all the petitioners, it would only affect those directly implicated, and but two of them have been named. Neither is the position of the bank open to question. The steps taken by Mr. McLean in its behalf are not to be impugned because there was no formal consultation with his associates. Where expedition is required, this often is not possible. The president of a corporation is its executive head, and his action is to be accepted in the first instance by virtue of his general authority to represent the company, subject to revision by the directors, if they are so moved; and as there has been no repudiation in the present instance of what was done by Mr. McLean, it therefore stands.

The petition is sustained, and an adjudication is directed to be entered in conformity therewith.