In re GEORGIA MFG. & PUBLIC SERVICE CO.

(District Court, N. D. Georgia. February 3, 1909.)

No. 2,233.

BANKRUPTCY (§ 72*) — CORPORATIONS—PRINCIPAL BUSINESS—MANUFACTURING —"PRINCIPALLY ENGAGED IN MANUFACTURING."

A corporation's charter provided that its principal business was to be the manufacturing, producing, purchasing, selling, and dealing in all kinds of paper, paper bags, box board, paper cones, and the like, and dealing in all ingredients, products, and compounds thereof, and in any or all materials used in connection with such manufacture. The company was authorized to operate waterworks and electric lights. The total production of the paper mills department between September 1, 1907, and June 30, 1908, was 43,086 tons worth $188,321.98. This department employed from 80 to 100 men with a yearly pay roll of $50,000, and an expense for the same period of $203,454. The waterworks department employed but one regular man and some time extra help, and the electrical light department four regular men. The total revenue from the light department for the same period was $12,077 and from the waterworks department $10,228, and the expenses light department $7,974, waterworks $9,207. *Held,* that the corporation was principally engaged in manufacturing, and was therefore subject to adjudication as a bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank of Mattoon, Ill. v. First Nat. Bank of Mattoon, Ill., 42 C. C. A. 4.]

In Bankruptcy. On plea to the jurisdiction and objection to adjudication.

E. E. Pomeroy and Clifford L. Anderson, for petitioning creditors. H. C. Peeples, Harold Hirsch, and D. W. Blair, for defendant.

NEWMAN, District Judge. This case was referred to George D. Anderson, Esq., Special Master, to take evidence and report upon the facts and law. His report is as follows:

"A petition was filed in the District Court of the United States for the Northern District of Georgia against the above-named corporation on the 1st day of August, 1908, alleging insolvency and certain acts of bankruptcy.

"On the same date a petition was filed in said court asking for a receiver to take charge of the assets of said company.

"Subsequently the defendant company and also certain creditors filed a plea to the jurisdiction of said court on the ground that said corporation was not 'engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits.'

"The defendant company and certain creditors demurred to the petition in said case on the ground that said petition did not allege that said company was engaged 'principally in manufacturing' but simply alleged that said company was engaged in manufacturing.

"The defendant company also filed its denial that it was a corporation engaged in manufacturing, but said that it was engaged in the business of supplying electricity and water.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"On August 22, 1908, this matter was referred to me as special master by the judge of said court, with instructions to hear and determine all questions of law and facts involved, and to report to the court my findings and conclusions.

"By agreement of all parties at interest, the case was continued from time to time until the 15th day of October, 1908, and on this date the hearings began at Marietta, Ga., at the office of the defendant company. After the hearings were concluded, counsel on both sides asked for and were allowed additional time in which to prepare and file briefs.

"At the first hearing the petitioning creditors filed an amendment alleging that the defendant company was engaged principally in manufacturing. This amendment was allowed with no objection by the defendant company.

"There was no denial of insolvency by the defendant company, nor of the commission of the alleged acts of bankruptcy, and the sole question to be determined was whether the Georgia Manufacturing & Public Service Company was engaged principally in manufacturing, and therefore such a corporation as could be declared a bankrupt under section 4b, of the bankruptcy act of July 1, 1898 (Act July 1, 1898, c. 541, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423]).

"It was admitted in the plea to the jurisdiction filed by the defendant company that it was a corporation chartered and existing under the laws of the state of Georgia.

"The acts of bankruptcy set forth in the petition against the defendant company were alleged to have been committed at different dates between June 1, 1908, and July 8, 1908. The debts of the petitioning creditors were alleged to have been contracted in the months of November and December, 1907, and in May, 1908, and it was admitted on the hearing that the indebtedness of the petitioning creditors as set forth in the petition was correct, and the acts of bankruptcy alleged were not denied.

"It was also agreed on the hearing that the making of paper from raw material such as was done by the defendant company was manufacturing as contemplated under the bankruptcy act of 1898. Counsel for the petitioning creditors and for the defendant company seem to be agreed that the only question to be considered is: 'Was the Georgia Manufacturing & Public Service Company engaged principally in manufacturing at the time of the commission of the alleged acts of bankruptcy?' I think this is the correct principle, and do not deem it necessary to cite the authorities to support this contention, as the briefs filed by both sides concede this to be the law.

"To properly determine this question it is necessary to consider some of the evidence adduced upon the hearings in said case:

"The evidence of J. H. McGinty, who was the secretary and treasurer of the defendant company, and who was called and sworn by the petitioning creditors, discloses the fact that the Georgia Manufacturing & Public Service Company began business on the 1st day of January, 1906, with a capital stock of $600,000, and that said company purchased and took over the business of the Marietta Paper Mills, the Marietta Electric Company, and of the Marietta Waterworks Company. These transfers were made on January 1, 1906, in the case of the paper mills, and on the 24th of the same month in the cases of the two other companies mentioned, and was engaged in the business of making paper, box-board, the supplying of electricity, and the furnishing of water. It was agreed that the consideration stated in the deed from the Marietta Paper Mills and the defendant company was $400,000. Between the Marietta Electric Company and the defendant company was $50,000, and between the waterworks company and the defendant company was $150,000.

"The witness McGinty testified that the total product from the paper mills department from September 1, 1907, to June 30, 1908, amounted in dollars and cents to the sum of $188,321.98; that the total receipts from the electric department for the same period amounted to $12,077; and for the waterworks department for the same period was $10,228. The yearly pay roll of the paper mills department was about $50,000, of the waterworks department was about $1,450, and that of the electric light department was about $2,400. The paper mills department employed from 80 to 100 men. The waterworks department only employed one regular man, and sometimes employed extra help, and the electric light department employed four regular men. The total expenses of

the paper mills department from September 1, 1907, to June 30, 1908, was $203,454, of the electric light department for the same period was $7,974, and of the waterworks department for this period was $9,207. The total production of the paper mills department for the period mentioned was 4,386 tons of paper, valued at an average price of $40 per ton. The total value in dollars and cents of the production of the paper mills department for this period was $188,321.98. The total revenue from the electric light department for the period named above was $12,077, and the total income from the waterworks department for this same period was $10,228. The paper mill used a great deal of water, and it was estimated that about 50 per cent. of the total supply of water furnished by the waterworks department was used in and about making paper, but very little electricity was used in the paper mill. An arbitrary amount of $250 per month was added and counted in the amount of the revenue received from the waterworks department for the water used in the paper mill, and an arbitrary amount of $75 per month for the electricity used in the paper mill.

"Alonzo Richardson was sworn for the petitioning creditors, and testified in part as follows: That he was a public accountant, and that he had made an examination of the books of the defendant company in either September or August, 1907. The president and vice president of the company were present when he made the examination and gave him access to the books of the company. He made a report of the condition of the company from January 1, 1906, to August, 1907. The books of the company showed the total assets of the company to be $977,173. From January 1, 1906, to August 31, 1907, the sum of $129,746.22 was expended in improvements to the plant and equipment, and of this amount $115,211.18 was expended on the paper mill proper, and $21,255 on a machine shop in the paper mill. On the waterworks department was expended the sum of $2,834.25 during this period, and for electric equipment was expended during this same period the sum of $4,470.22. The gross income from the electric department during this period was $24,274, from the waterworks $18,353 gross, and from the paper mill the sum of $360,448.05 for this same period. The total cost of the operation of the paper mill for this period was $381,998.04, of the electric plant $16,066.68, and of the waterworks the sum of $18,353. This testimony was objected to by the defendant company on the ground that it was irrelevant and immaterial, but I allow the testimony to go in for the reason that it shows the general nature of the business, because it shows what the company had been doing since its organization, and, in the absence of any testimony showing that the business had been changed in any way, it is fair I think, to presume that the business of the defendant company was the same at the time the alleged acts of bankruptcy were committed that it had been before that date. The defendant company introduced no evidence on the hearing, and it seems reasonable to hold that the business of the defendant company was the same as it had been during the time of the existence of the company.

"Section 4 of the charter of the defendant company reads as follows, in part: 'The principal business they propose to carry on is the manufacturing, producing, purchasing, selling and dealing in all kinds of paper, paper bags, box board, paper cones, and the like, and dealing in any and all ingredients, products and compounds thereof, and in any and all' materials that are now or may be hereafter used in connection with such manufacture. * * *' This same charter also gave the defendant company the right and privilege to operate waterworks and electric lights, but it set forth the 'principal business' of the company as stated above. I recognize the legal principle that the business of this corporation is not necessarily that stated in its charter, but was what it was really and actually doing at the time when it might have come within the provisions of the bankruptcy act. In re Chicago-Joplin Lead & Zinc Co. (D. C.) 104 Fed. 67. Still, if the charter states that the principal business of a corporation shall be or is a certain thing, and the proof shows that during its existence said company has been doing that very kind of business, it is relevant and material testimony, and also throws considerable light on what its business was at a particular time, especially when there is no evidence to the contrary. The testimony further disclosed the fact that the defendant company furnished water and lights to the city of Marietta to

factories and manufacturing plants, and to private citizens, and had pipes and wires and poles in and through the streets of the city of Marietta; that said company had about 300 water customers, and about 250 electricity customers.

"Summing up some of the testimony herein mentioned, I find that the Georgia Manufacturing & Public Service Company from the 1st day of January, 1906, until the time that it was placed in the hands of a receiver, was engaged in the manufacture of paper, and the furnishing of water and electricity. During this time there had been employed in the paper mill proper, when it was running from 80 to 100 hands, in the waterworks department only 1 regular hand, and 4 regular men in the electric department. The total manufactured product of the paper mill was $548,770.03 for this period, the total revenue derived from the electric light department for this same period was $36,351, and that derived from the water department during this time was $28,581, making the total receipts from these two last-named departments $64,932. These figures mean the gross receipts, and the expenses of operation are not deducted. The total expenses of the paper mill proper for the same period were $585,452.04, and the total expenses of the other two departments for this time were $51,601.68. This discloses the fact that approximately in round numbers the volume of business done by the paper mill proper and the other two departments, as shown both by the gross receipts and the expenses, stands in about the ratio of one to 10; the larger amount being in both instances on the side of the paper mills. These facts prove conclusively to my mind that, not considering the provisions of the charter of this company, the business in which it had been engaged during the period referred to in the testimony adduced was principally manufacturing. There was no testimony offered by the defendant company going to show the nature of its business, and the evidence of J. H. McGinty, for the petitioning creditors, discloses that at the time the petition was filed the paper mill department was not running, but water and electricity were still being furnished. Mr. McGinty testified that the mill, the paper mill, had not been running much since April 1st of this year; that the market for paper had been depressed during the previous six months—that is, the six months previous to the 1st of August—but had run along from time to time, and had not been running for a few days immediately preceding the 1st day of August, 1908, but he could not recall exactly what day the mill shut down. This witness was an officer of the defendant company, and he offered no testimony to the effect that this shutting down was intended to be permanent, but I do not consider that this would be very material, as the debts contracted in December of the previous year remained unpaid, and the same witness testified that the production of paper for the month of June, 1908, was 306 tons, for April the same year 518 tons, for March same year 303 tons, and 361 tons for the month of July of the year 1908. The testimony is that this paper was worth an average of $40 per ton, which shows that the value of the product of the paper mill was over $10,000 for the month in which the least amount of paper was made. It was during the months of June and July, 1908, that the acts of bankruptcy were alleged to have been committed, and the testimony shows that at this very time the business of the manufacturing department aggregated nearly five times as much as the combined receipts of the other two departments of the defendant company, the testimony being that the combined receipts of the water and light departments only averaged $2,300 per month.

"After considering all of the testimony and the law produced to me, I have come to the conclusion that the defendant company operated the water and electric departments as an incident to its business, because the testimony shows that the gross receipts from these two departments averaged only $2,300 per month, and I think the facts will sustain this finding. If it were otherwise, we would be confronted with the proposition that the principal business of the defendant company was furnishing water and lights as is insisted in the demand for a jury trial filed by the defendant company. If this were true, there would be a business with a capital stock of $600,000 furnishing water and lights where the gross receipts was only an average of $2,300 per month, and operating as an incident thereto a paper mill whose gross receipts from its manufactured product from January 1, 1906, to August 1, 1908, was

over $548,000, and whose total expenses was over $585,000, and whose monthly pay roll embraced from 80 to 100 hands, at an average of $5,000 per month, a little more than twice as much as the combined gross receipts of that part claimed to be the principal business. To my mind such a proposition is not sustained by the facts. I am unable to form a definite opinion from the evidence in the case whether or not the making or generating of electricity is manufacturing as contemplated under the bankruptcy act of 1898, as the witness stated that it had never been explained where and how it was obtained, and that scientists were still figuring on the question. I do not think that a waterworks company—strictly and only a waterworks company—could be adjudicated bankrupt if it was engaged only in supplying water to the public. In re Morris, 102 Fed. 1004, 43 C. C. A. 91 (affirming In re New York & W. Water Co. [D. C.] 98 Fed. 711). But this rule would not apply in this case, as there was no waterworks company involved, but the defendant company owned and operated a waterworks plant, using approximately one-half of the total supply of water itself in and about the manufacture of paper, and selling the rest to the public. Therefore, applying the rule laid down in Re Slate Company, 16 Am. Bankr. Rep. 407, 144 Fed. 737, 75 C. C. A. 603, cited by petitioning creditors and by the defendant company, 'where a corporation is engaged in several different occupations, some of which are within the classes subject to bankruptcy and others outside, it is the aggregate of business done in the classes within the law as compared with the aggregate of those without.'

"I find that the Georgia Manufacturing & Public Service Company was engaged 'principally in manufacturing' as contemplated by section 4b of the bankruptcy act of 1898 at the time of the alleged acts of bankruptcy, at the time of the contraction of the debts due the petitioning creditors, and, in fact, during the whole time of its existence from January 1, 1906, up to the time of the filing of the petition in bankruptcy and subject to the jurisdiction of the bankruptcy court."

Exceptions have been filed to the above report of the special master. The exceptions, although there are several of them, raise really a single question, and that is as to the correctness of the master's finding that the Georgia Manufacturing & Public Service Company was engaged "principally in manufacturing." I think the evidence and the conclusions of fact deduced by the master from the evidence fully justify his finding in this respect. The larger part of the business of the Georgia Manufacturing & Public Service Company was clearly that of manufacturing paper. The suspension of this business seems to have been temporary only, and such a suspension as had happened several times before, due to the lack of demand for the manufactured paper.

The exceptions will be overruled, and the report of the master confirmed. Let the adjudication be entered.