### In re PHILADELPHIA FREEZING CO.

(District Court, E. D. Pennsylvania. November 24, 1909.)

#### No. 3,434.

BANKRUPTCY (§ 72*)—PERSONS WHO MAY BE ADJUDGED BANKRUPT—CORPORATIONS—NATURE OF BUSINESS—"ENGAGED PRINCIPALLY IN MANUFACTURING, TRADING, AND MERCANTILE PURSUITS."

A corporation was chartered "for the purpose of conducting the business of a cold storage warehouse, * * * furnishing cold storage for meats, produce, fruits, and other perishable merchandise." The business actually done by it was the conducting of a cold storage warehouse in which produce, etc., was preserved for others for hire, by means of brine circulated through pipes; and it also operated a pipe line running through the street and connected with storage rooms of others, which it refrigerated by means of the brine pumped through the pipes and circulated in such rooms, returning to the tank in its own plant. For this service it charged in proportion to the size of the rooms cooled, and it constituted the larger part of its business. The brine was made in its plant by mixing calcium chloride in water at a certain temperature to a certain consistency. The calcium chloride was a manufactured product sold in the market, which it purchased in cases, and the brine was made by ordinary workmen under direction of a superintendent. *Held*, that such corporation was not "engaged principally in manufacturing, trading, or mercantile pursuits," within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S.

Comp. St. 1901, p. 3423), and was not subject to be adjudged an involuntary bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 17; Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 8, pp. 7650–7651; vol. 5, pp. 4346–4358; vol. 8, pp. 7053, 7054; vol. 5, pp. 4477, 4478.

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank of Mattoon, Ill., v. First Nat. Bank, 42 C. C. A. 4.]

In the matter of the Philadelphia Freezing Company, bankrupt. On report of Alfred Driver, special referee, on petition for involuntary adjudication, and answers of the Hub Machine & Tool Company and Armstrong & Latta Company, creditors. Report confirmed and approved.

The following is the report of Special Referee Alfred Driver:

The Philadelphia Freezing Company is a corporation under the laws of Pennsylvania, and was formed, as is shown by the application for a charter, approved by the Governor on March 5th, 1903, "for the purpose of conducting the business of a cold storage warehouse, * * * furnishing cold storage for meats, produce, fruits, and other perishable merchandise."

Afterwards, on June 29, 1908, the real, personal, and mixed property of the corporation and the franchises and rights of the said Freezing Company were sold at judicial sale by George D. Woodside, receiver, appointed by the court of common pleas No. 5 of Philadelphia county, and conveyed to certain persons by said receiver. Afterwards the said purchasers met, and under the provisions of the act of assembly approved May 25, 1878 (P. L. 145), as amended by the act of assembly approved May 31, 1887 (P. L. 278; 1 Pepper & Lewis' Dig. p. 979, par. 100), organized a new corporation. The name adopted by the new corporation is the Philadelphia Freezing Company. Under the proceedings for reorganization there is no statement of the purposes for which the corporation was formed, and under said act of May 31, 1887, said new corporation was vested with all the rights, powers, immunities, privileges, and franchises of the corporation as whose the same may have been so sold, and which may have been granted to or conferred thereupon.

By the answer of the said Hub Company it is alleged that it does not appear by the petition or by the record that this court has jurisdiction to adjudge said Freezing Company a bankrupt, in that "it does not appear that said company is a corporation engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits, and that it is engaged in the business of conducting a general cold storage plant and warehouse; that it operates and conducts a line of pipe lines underneath the surface, which extends to neighboring buildings and plants and returns to the plant of said Freezing Company; that through these lines of pipe a substance known as brine is conducted to the neighboring buildings and plants, whereby the air in the refrigerating plants of said neighboring buildings and plants is cooled, and said brine or substance by continuing on through the pipes is returned to the plant of the Freezing Company."

It is alleged in the petition for adjudication that said Freezing Company "is principally engaged in a general cold storage business at 48 North Delaware avenue, Philadelphia."

On the 1st day of October, 1909, the evidence of the president of the said Freezing Company was taken by the petitioning creditors and said witness testified that the business of the corporation has been refrigerating by means of brine, which is manufactured on the premises and circulated through pipes for preserving produce; that the company sells the brine to people who require it for freezing purposes at so much per year; that in addition the company does a storage business, and preserves goods in storage by the circulation of brine which is manufactured there; that the business is a commercial necessity for the preservation of perishable products, and that it is recognized as a mercantile business all over the United States; that to carry out the purposes of

the corporation it employs a manufacturing plant, which plant is located on the real estate of the company at 48–54 North Delaware avenue, and occupies the ground floor of the entire building, with boilers, refrigerating machines, and the necessary pumps and appliances for the purposes of manufacturing brine and cooling it, and that the brine is circulated through pipes in this building, and there is also a line running through the street, which connects with about 40 properties in that street which are refrigerated from this central plant; that the brine is circulated through these pipes from pumps in the central plant, and that the properties which are served by the company are piped by the owners. These rooms are cooled by means of the circulation of the brine for a price per cubic foot of the space to be cooled. This witness says that the brine is prepared on the premises of the Freezing Company, and that the basis is calcium; that the calcium is bought in drums, and that the preparation which he calls brine is made from calcium, and water and ammonia is used to make it cool. This witness also says that the business of the Freezing Company has largely been a business of supplying brine to others from which the receipts have been about three times as much as from the storage business which they conduct. He stated that it requires an expert laborer to produce this brine. After it is made it is taken by pumps and circulated through the coolers and pipes, and it is cooling while it goes through a certain portion of the pipes which are surrounded by ammonia.

No other evidence was taken by the petitioning creditors, and no cross-examination was made by counsel for the Hub Company of said witness. No evidence on behalf of the Hub Company was taken.

Afterwards, on October 15, 1909, the petition of Armstrong & Latta Company, Incorporated, a creditor, was filed for leave to intervene. It was ordered by the court that said Armstrong & Latta Company be allowed to intervene as an answering creditor, and have leave to prosecute the answer of the Hub Company filed April 12, 1909, with the same force and effect as if the said answer had been filed by them. On October 18, 1909, the petition of said intervening creditor was referred to the undersigned, and, after notice to the said Freezing Company, to counsel for the petitioning creditors, and to counsel for said Hub Company, the evidence of John P. Maher, a witness called by said Armstrong & Latta Company, was taken on October 21, 1909, on ʾlf of said intervening creditor. Counsel for the petitioning creditors anc ʋunsel for said Hub Company did not attend the examination of said John P. Maher, nor did any one attend on behalf of the Freezing Company.

Said witness John P. Maher testified that he has been connected with the business of refrigerating and cold storage about 25 years; that he is familiar with the character of the business conducted by the said Freezing Company and with the building in which the business is conducted; that it had been a cold storage plant for about 12 years; that the building was used for cold storage several years previous to the installation of the pipe line. He said that brine consists of water and coarse rock salt dissolved in water, soʾas to make a solution of a certain consistency, and that this is the ordinary method. He says, also, that the latest practice is to dissolve chloride of calcium in water, which makes brine without salt. Chloride of calcium comes in cases. It is a manufactured product, which can be bought on the market as any other material can be bought, and is bought and sold in quantities for use in refrigerating purposes. Brine produced by this method is not a thick liquid. It is simply the consistency of brine water. In answer to the question, "Does it require any skill or particular knowledge in order to dissolve this chloride of calcium?" he said: "It is generally dissolved by ordinary help under the direction of the engineer of the plant; that it is put into a tank or barrels, and turned into the general brine tank, the calcium being dissolved in water until the brine reaches a certain temperature, say about 105 degrees Centigrade; that it is then considered proof against freezing in the ordinary term; that it then passes from this tank into the main brine storage tank, and is stored there until it is used as of this degree of temperature. He says that if anybody wanted brine it could be sold, and people could refrigerate with it by the application of ice; that after it is cooled it is usually used in connection with pipe lines; that he has never known brine to be bought or sold as a marketable commodity; that if it was purchased as it stood in the tank, and

taken away, before it could be used for refrigerating it would be necessary to make it cool by the application of ice or otherwise, and that after that had been done it could then be made to circulate through pipes and complete the refrigeration. After the brine has been produced, he says it is cooled with ice or by a coil of pipes submerged in the brine tank, and in these pipes ammonia gas is expanded, which reduces the temperature of the brine to the desired degree; that the brine then is pumped through coils of pipes into the cold storage rooms, and returns back to the tank, to be recooled and pumped over again.

This witness states that this process is not ordinarily considered manufacturing, for the reason that all the ingredients used in making brine are already manufactured; that he had never heard the making of brine called a manufacturing business; that he never knew of brine being bought and sold as a commodity. He says this mixture, which is called brine, is produced by taking so much calcium and so much water and stirring them together with a stick by hand; that as much water is used as is necessary to dissolve the calcium into a liquid of a certain thickness; that ordinarily the brine is a little thicker than water; that it does not require skilled labor to stir the calcium with the water; that the brine originally has a temperature, before it is cooled by the use of the ammonia, of about the same degree as tepid water, and of course the heat must be taken from it before it can be used and circulated for refrigerating purposes.

The petitioning creditors contend that the Freezing Company is engaged principally in manufacturing. On the other hand, the Hub Company by its answer and the Armstrong & Latta Company by evidence contend that the business conducted by the Freezing Company is not manufacturing.

The charter of this company does not state that it is chartered for the purpose of manufacturing.

In Re H. J. Quimby Freight Forwarding Company (D. C.) 121 Fed. 139, the court said:

"The susceptibility of a corporation to bankruptcy does not depend wholly upon its charter. This is clear, both from the language of the act, which speaks, not of the corporation's charter powers, but of the business in which it is principally engaged, and also from the decided cases. A corporation may have charter powers to do that which is not its principal business; but a corporation can hardly be brought within the scope of the bankrupt act [Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418)] by a principal business which is beyond the authority given by its charter."

In Re Kingston Realty Company, 160 Fed. 445, 87 C. C. A. 406, the Circuit Court of Appeals for the Second Circuit says:

"It is true that the susceptibility to bankruptcy of a corporation does not depend upon its charter. Matter of Quimby, 121 Fed. 139, quoted with approval by this court in Re Construction & Dry Dock Company, 130 Fed. 447 [64 C. C. A. 648]. Whether it can be adjudged a bankrupt depends upon what it actually does, not what it is empowered to do."

Is the business in which the Freezing Company is engaged principally manufacturing? The president of the company testifies that the company manufactures brine. There is no evidence to show that it is engaged in manufacturing any other commodity. The brine is composed of water and calcium mixed together. Is the production of brine manufacturing?

In the case of Hall & Kaul Co. v. Friday, 158 Fed. 593, 87 C. C. A. 23, it appears that the Monongahela Construction Company in carrying on its business, combined together raw materials such as cement, gravel, and sand in the making of concrete, and supplied labor, machinery, and appliances necessary for the proper carrying on of said business of constructing and erecting concrete arches, piers, buildings, and structures, and excavating therefor at such times and places as its contracts call for; that it carried on no other manufacturing business except the above. The District Court for the Western District of Pennsylvania adjudicated said company a bankrupt, as being a corporation engaged principally in manufacturing. Appeal was taken to the Circuit Court of Appeals for the Third Circuit, and Judge Gray in his opinion says:

174 F.—45

"The words 'manufacture' and 'manufacturing' seem to us to have a well ascertained and defined meaning. There is no confusion in the general concept conveyed by these words, as referring to the making of raw materials or natural substances by hand, art or machinery, with more or less skill, into commodities for use. The leading lexicographers all agree as to this general signification. No special, technical, or legislative use of them, different from their general or popular use, has been suggested. It appears from the agreed statement of facts that the Monongahela Construction Company carried on no manufacturing business unless the business of 'making, constructing and erecting concrete arches, bridges, buildings, walls and other structures, also excavating, grading and ballasting of roadbeds and laying tracks for rail roads' be such a business. The alleged bankrupt therefore in this case was a builder or constructor of concrete arches, bridges, buildings, walls and other structures. These were erected in situ, and when erected were attached to and became part of the real estate. No one in ordinary parlance would ever think of saying that such a builder was a manufacturer of bridges, houses, etc. It is only by a forced construction founded on verbal refinements that such a conclusion can be arrived at. It is true that such a builder assembles and combines the raw materials of cement, sand and water, which are mixed with more or less skill with tools and appliances adapted for such purpose, and the composite thus formed, being poured into molds, gradually and by successive repetitions of the process forms the arch, building, or wall intended to be erected. We cannot see upon what possible grounds a person or corporation engaged in this work is to be distinguished from one engaged in the erection of an arch, building, or walls with other materials such as stone, bricks, and mortar, or how, except arbitrarily, the one can be called a manufacturer and the other not."

The decree of the court below was reversed, with directions to dismiss the petition of the petitioning creditors.

In the case of Hall & Kaul Co. v. Friday it is decided that the combining of cement, gravel, and sand, mixed with more or less skill, in the making of concrete, is not manufacturing. Following that decision, which is controlling, the combination or mixing of water and calcium, resulting in what is called brine, cannot be called manufacturing.

It seems to be contended by the petitioning creditors that the Freezing Company is engaged in mercantile pursuits, as well as in the manufacturing business. The evidence shows that the Freezing Company does not buy or sell any commodity and is not engaged in trading or mercantile pursuits.

The evidence shows that the brine is not sold. After it is cooled it is transmitted through pipes to customers who conduct a cold storage business in the neighborhood, and returns to the receiving tanks of the company. The brine does not remain in the buildings of the customers, and is not purchased by them in quantity. These customers pay by the cubic foot for the reduction of the temperature in the rooms they use for cold storage purposes, by the circulation of the brine through pipes which belong to the customers. The Freezing Company does not own the pipes in the buildings of the customers, whose rooms are cooled by the brine passing through the pipes. There is little, if any, leakage, and the brine remains substantially the same in quantity after returning to the tanks of the Freezing Company as it was when the circulation through the pipes began.

In Re Kingston Realty Co., 160 Fed. 447, 87 C. C. A. 408, the Circuit Court of Appeals for the Second Circuit, citing the decision of Judge Brown, in Re N. Y. & W. Water Co. (D. C.) 98 Fed. 711, at page 713 says:

"In Bouv. Law Dict. a trader is defined as 'one who makes it his business to buy merchandise or goods or chattels, and to sell the same for the purpose of making a profit.' Black, Law Dict. says: 'One whose business is to buy and sell merchandise or any class of goods deriving a profit from his dealings.' And the weight of authority seems to be that the proper description of the business of a trader includes both buying and selling either goods or merchandise, or other goods ordinarily the subject of traffic. * * * The words 'mercantile pursuits' may have a little broader signification than 'trading.' 'Mercantile' is defined by the Century Dictionary as having to do with trade or commerce; of or pertaining to merchants, or the traffic carried on by mer-

chauts; trading; commercial. It signified for the most part the same thing as the word 'trading'; and by 'mercantile pursuits' is meant the buying and selling of goods or merchandise, or dealing in the purchase and sale of commodities, and that, too, not occasionally or incidentally, but habitually as a business. * * * These terms are restricted also to dealings in merchandise, goods, or chattels, the ordinary subjects of commerce."

And that court says further on page 448, of 160 Fed., page 409, of 87 C. C. A.: "Dealing in articles of commerce—goods and merchandise—alone constitutes trading or a mercantile pursuit as those terms are used in the statute."

If it be contended that the Freezing Company is conducting a warehouse in which it receives perishable products and preserves them in cold storage, it is not subject to adjudication as an involuntary bankrupt. "A corporation conducting a public warehouse, in which it receives and stores grain and other merchandise for hire, issuing receipts therefor, is not engaged in trading or mercantile pursuits, and is not subject to be adjudged an involuntary bankrupt." In re Pacific Coast Warehouse Co. (D. C.) 123 Fed. 749.

The referee finds that the said Freezing Company is not a corporation engaged principally in manufacturing, or in trading, or in mercantile pursuits, and is not subject to be adjudged an involuntary bankrupt. The referee recommends that the petition for adjudication should be dismissed for want of jurisdiction.

Julius C. Levi, for petitioner.

William B. Davis, T. Henry Walnut, and Henry M. Du Bois, for creditors.

J. B. McPHERSON, District Judge. Report of the special referee confirmed.