## In re C. JUTTE & CO.

### Appeal of GRIBBLE et al.

(Circuit Court of Appeals, Third Circuit. July 8, 1920.)

#### No. 2566.

Bankruptcy ☞72(1)—Corporation held not subject to involuntary adjudication; "engaged principally in mining and mercantile pursuits."

A corporation chartered, inter alia, for mining and dealing in coal, and which for a time engaged in such business, but which for more than two years had neither mined nor purchased coal, but was engaged solely in transporting coal for others, *held* not subject to adjudication as an involuntary bankrupt, under Bankruptcy Act, § 4b, as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797, as a corporation "engaged principally in * * * mining or mercantile pursuits."

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

In the matter of C. Jutte & Co., alleged bankrupt, E. B. Gribble and

another appeal from a decree dismissing an involuntary petition. Affirmed.

See, also, 258 Fed. 422, 169 C. C. A. 438.

A. Devoe P. Miller, of Pittsburgh, Pa. (George D. Wick and Reed, Smith, Shaw & Beal, all of Pittsburgh, Pa., of counsel), for appellants.

Robert J. Dodds, of Pittsburgh, Pa., for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

PER CURIAM. The 1903 amendment extended the bankrupt law to corporations "engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits," and this case turns on the question of fact whether C. Jutte & Co., alleged bankrupt, a Pennsylvania corporation, was engaged principally in mining and trading in coal. If it was so engaged, then the decree below dismissing the petition in bankruptcy, based on a finding by the court that it was not so engaged, was in error, and should be revised. The court below, in an opinion the pertinent parts of which are printed in the margin,[1] dis-

---

[1] "The corporation in this case resists the motion for adjudication, because it claims to have been engaged principally in the transportation of coal for other parties, and not engaged principally in mining and trading in coal, as averred in the involuntary petition.

"The charter of the corporation recites that said corporation 'is formed for the purpose of mining coal, and the manufacture of coke therefrom, with the right to mine, manufacture, sell, or dispose of either in crude or manufactured form, such fire clay and other minerals as may be incidentally developed, and the transaction of such other business as may be necessary to properly carry out the objects and purposes of the company.' The corporation began business in 1901, and continued in business, so far as appears, until the involuntary petition was filed. The evidence shows that the business carried on by it in its early history was principally that of mining coal, in addition to which it was engaged in the business of transporting coal for others. The greater volume of its business at the start was the mining of coal; whereas for a period of over two years prior to the filing of the petition its business was wholly that of a transportation company. Its receipts from the transportation business increased from $20,181.72 in 1902, to $174,246.74 in 1905, for which year its receipts from transporting coal for others were at the maximum. After 1904 the company had no receipts from coal mined. After 1905 the company had no receipts from coal purchased and sold. Its receipts from transportation were $116,997.35 in 1906, $134,789.10 in 1907, and $4,198.99 in that portion of 1908 prior to the filing of the involuntary petition. For the first three years its gross receipts from mining coal and from transporting coal for others was $248,968.63, while the gross receipts from the purchase and sale of coal during the same time were $191,948.07, which included the cost of towing the 95,353 tons represented by such receipts to the points of sale from the mines where purchased. Information as to such cost does not appear to have been given, except that in the case of coal sold at New Orleans it amounts to nearly $1 per ton. As the evidence fairly shows that much of said coal was towed for long distances, to points such as Louisville and New Orleans, such gross receipts should be greatly diminished with a result in favor of the equipment for transportation. During the next three years, beginning with 1904, the evidence shows that the gross receipts from the business of transporting coal for others were $450,491.06, while the gross receipts from coal mined and from coal purchased and sold during the same period were only $247,484.86. The number of tons purchased and sold during this period was 119,300, and the cost of towing

cussed the facts in detail, and we avoid needless restatement by reference to its opinion. An examination of the proofs leads us to the same conclusion as the court below.

We therefore adopt its views, and affirm the decree based on such conclusion.

the same was included in the gross receipts last mentioned, which must be considered at least as giving volume to the general transportation business of the company. In 1904 there was no mining carried on by the corporation after May 15th, prior to which there had been mined in that year 10,413 tons only, from which the gross receipts were $9,003.60. The involuntary petition was filed April 6, 1908. Prior to that date, for almost four years, therefore, no mining was carried on by the corporation, and for two and one-quarter years the corporation had not sold purchased coal. Yet the corporation during those periods was engaged actively in transporting coal for others and was receiving large returns therefrom. * * *

"It was first by the amendment of 1903 that the provisions of the Bankruptcy Law were extended to corporations engaged principally in mining. This corporation, prior to the amendment of 1903, was exempt from the provisions of the Bankruptcy Law. By ceasing to be engaged in the mining pursuit after the amendment of 1903 was passed and engaging principally in the business of transportation it seems to have remained still in the exempt class. * * * Believing that the susceptibility of a corporation to bankruptcy depends on the business it actually transacts, and not on the business it is empowered by charter to do, as seems to be the result of the reasoning in the cases of In re New York and Westchester Water Co. (D. C.) 98 Fed. 711, affirmed by the Court of Appeals of the Second Circuit, in Re Morris, 102 Fed. 1004, 43 C. C. A. 91, and Kingston Realty Co., 160 Fed. 445, 87 C. C. A. 406, the court must find that the corporation in this case should not be adjudicated a bankrupt."