## In re HUDSON RIVER ELECTRIC POWER CO.

(District Court, N. D. New York.   September 27, 1909.)

1. BANKRUPTCY (§ 72*) — CORPORATIONS SUBJECT TO ACT — NATURE OF CORPORATE BUSINESS—"MANUFACTURING"—"MERCANTILE."

A corporation engaged in generating electricity, transmitting it, and selling power or light to consumers, is neither a "manufacturing" nor a "mercantile" corporation within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025), and is not subject to adjudication as an involuntary bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 5, pp. 4346-4357; vol. 8, p. 7716; vol. 5, pp. 4477, 4478.]

2. BANKRUPTCY (§ 60*)—"ACT OF BANKRUPTCY"—RECEIVERSHIP.

The appointment of temporary receivers for a corporation by a Circuit Court, under its general equity powers, in a pending suit which has not been heard, and in which there has been no adjudication of insolvency, does not constitute an "act of bankruptcy," under Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 60.*

For other definitions, see Words and Phrases, vol. 1, p. 118; vol. 8, p. 7562.]

3. BANKRUPTCY (§ 63*) — ACTS OF BANKRUPTCY — ADMISSION BY DEBTOR—CORPORATIONS.

Where a Circuit Court appointed receivers of the property of a corporation, and granted an injunction restraining its officers and agents from commencing or prosecuting any proceeding "involving in any way the property or property rights" of the corporation, or incumbering or embarrassing the same, the subsequent adoption by the directors of a resolution confessing its insolvency and stating its willingness to be adjudged a bankrupt was a violation of the injunction, and unauthorized, and did not constitute an admission by the corporation, which constitutes an act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 63.*]

4. BANKRUPTCY (§ 18½*)—CONFLICTING JURISDICTION.

Where a Circuit Court in a suit in equity has taken possession by its receivers of the property of a number of related public service corporations operated as one, and is continuing the business in the same manner, a District Court, as a court of bankruptcy, will not, on petitions against one or more of such corporations, make an adjudication of bankruptcy, and thus interfere with the possession and administration of its property by the Circuit Court.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 18½.*]

5. BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—NATURE OF CORPORATE BUSINESS—"PUBLIC SERVICE CORPORATION."

An electric company, organized under the transportation law of New York, was engaged in transmitting and selling electricity for light and power to private consumers and street railway lines in a number of towns and villages, for which it had franchises. It also kept electrical supplies in store, which it sold chiefly to its consumers of electricity. It did not generate electricity, and had no plant for so doing, but purchased the same from other corporations, although it owned its own transmission lines and stations. Held, that it was a public service corporation, and not principally, if at all, engaged in trading or mercantile pursuits, within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32

Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025), and was not subject to adjudication as an involuntary bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*]

6. BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—NATURE OF CORPORATE BUSINESS.

A corporation, organized under the transportation laws of New York, which owns and operates a plant for generating electricity, which it transmits by means of its own lines and sells chiefly to municipal corporations for power and light, and to railroad and traction companies for running cars, is not engaged principally in manufacturing, trading, or mercantile pursuits, within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*]

7. BANKRUPTCY (§ 76*)—PETITIONING CREDITORS—PERSONS ENTITLED TO JOIN IN PETITION.

One who shipped goods to a corporation on its order, and billed and charged the same to said corporation, by which it was customarily paid, is not entitled to join in a petition in bankruptcy against another corporation merely because its stock was owned and its business controlled by the purchasing company, which fact did not make the latter an agent, even though by its directions the goods were shipped to the subsidiary company.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 76.*]

8. BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—NATURE OF CORPORATE BUSINESS—"ENGAGED PRINCIPALLY IN MANUFACTURING, ETC., PURSUITS."

A gas and electric company, organized under the transportation laws of New York, having a franchise to maintain pipes and wires in the streets of a village and a contract for lighting its streets, which manufactures gas and purchases or generates electricity, both of which it transports or transmits and sells to its customers, its electrical business exceeding its gas business in volume and revenue, is not "engaged principally in manufacturing, etc., pursuits," within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 8, p. 7650.]

9. BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—NATURE OF CORPORATE BUSINESS.

A gas company, which makes, transports through pipes, and sells gas to special customers within a limited area, is not principally engaged in either manufacturing, trading, or mercantile pursuits, within the meaning of Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*]

10. BANKRUPTCY (§ 72*)—CORPORATIONS SUBJECT TO ACT—PUBLIC SERVICE CORPORATIONS.

Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1025), does not include in the classes of corporations thereby made subject to the act public service corporations or quasi public service corporations, such as water, gas, or electric companies, operating under franchises.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

11. BANKRUPTCY (§ 78*)—INVOLUNTARY PROCEEDINGS—RIGHT OF RECEIVER TO CONTEST.

Receivers appointed by a Circuit Court for the property of corporations, who are in possession of the property and conducting the business under orders of the court, have the right to contest proceedings in bankruptcy against such corporations.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 78.*]

12. BANKRUPTCY (§ 91*)—INVOLUNTARY PROCEEDINGS—BURDEN OF PROOF.

In involuntary proceedings in bankruptcy against a corporation, the burden rests on the petitioners to prove by a fair preponderance of evidence that the corporation is within one of the classes against which such proceedings are authorized by the bankruptcy act.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 91.*]

In Bankruptcy. Separate petitions in the matter of the Hudson River Electric Power Company, of the Hudson River Electric Company, of the Hudson River Power Transmission Company, of the Saratoga Gas, Electric Light & Power Company, and of the Madison County Gas & Electric Company, alleged bankrupts. Petitions dismissed.

See, also, 167 Fed. 986.

These are five independent proceedings, in a sense, and still the same determination that is reached in one should obtain in all for reasons stated. The main question is: Are the corporations involved subject to the bankruptcy law? As the same questions, on similar facts, not identical, are involved in each case, they will be considered together.

Abram J. Rose and George B. Curtiss, for alleged bankrupts (each case).

James A. Van Voast, for a creditor in each case opposing adjudication, except in the Saratoga Gas & Electric Co. case.

Wyman S. Bascom (H. C. Todd, of counsel), for petitioning creditors in Hudson River Electric Power Co. case.

Henry W. Williams (H. C. Todd and C. S. Lester, of counsel), for petitioning creditors in Hudson River Electric Co. case.

C. C. & C. S. Lester (H. C. Todd, of counsel), for petitioning creditors in Hudson River Power Transmission Co. and Saratoga Gas, Electric Light & Power Co. cases.

James Moore, for petitioning creditors in Madison County Gas & Electric Co. case.

RAY, District Judge. By purchase of stock and otherwise the corporations above named and the Hudson River Water Power Company, the Empire State Power Company, and the Ballston Spa Light & Power Company, eight corporations in all, came under one ownership and management. They, and the companies as a whole, were organized and combined to generate electricity and manufacture gas, and transmit and sell same to customers and consumers, in the main to corporations, municipalities, and railroads. Each was a public service corporation. Each was incorporated under the transportation laws of the state of New York. While engaged in this business, and under the one management, and on the 26th day of October, 1908, a bill in equity was filed in the Circuit Court of the United States for the Northern District of New York, the district of the residence of such corpora-

---

tions, and where they were carrying on business, alleging their insolvency, unwise and prodigal management, etc., asking the appointment of a receiver and the winding up of the corporations. Each corporation is heavily bonded, the bonds being secured by mortgages on the properties, and each has a large unsecured indebtedness. This bill was presented to the court some days before its filing, and an order to show cause and containing an injunction clause was issued.

On the 31st day of October, 1908, George W. Dunn, Charles W. Andrews, and Milton Delano were appointed receivers of the properties of said companies and authorized to continue the business; the allegation and general concession being that all the companies should be conducted as one, and the business conducted as one business enterprise, as formerly. Since the institution of these proceedings in bankruptcy, permission has been granted to the parties interested to intervene in that suit and commence and prosecute foreclosures of the mortgages referred to, and such foreclosures have been instituted and the receivership extended to such foreclosure suits. A careful inventory and appraisal of the various properties has been made by such receivers, and appraisers duly appointed, and from such appraisal it appears that the value of the properties involved are as follows:

| | |
|---|---|
| Hudson River Water Power Company | $3,049,612 40 |
| Hudson River Electric Power Company | 1,526,037 03 |
| Hudson River Electric Company | 852,803 89 |
| Hudson River Power Transmission Company | 681,199 21 |
| Empire State Power Company | 357,654 73 |
| Saratoga Gas, Electric Light & Power Company | 443,701 98 |
| Madison County Gas & Electric Company | 150,634 69 |
| Ballston Spa Light & Power Company | 56,024 29 |
| Total | $7,117,698 22 |

This puts no value on the various franchises owned by the various companies. The inventoried value of the companies involved in these bankruptcy proceedings, exclusive of franchises not valued, is $3,654,-376.80. There are litigations pending and conflicting claims as to the ownership of properties, or some of them, or some parts thereof, as between these companies, and their liability to creditors, etc. If placed in bankruptcy, it is quite certain that several trustees would be elected, and that almost interminable litigation would arise between them. It would in such event be difficult, if not impossible, to continue to operate the companies as one whole until a sale, and the effect upon a pending effort to reorganize, protect all, so far as practicable, and continue this vast and important business, cannot be foretold.

While these considerations are not to affect or deter this court in making adjudications, if the companies are subject to the bankruptcy law, they are worthy of consideration in determining the real purpose of Congress in enacting that law and the character of the corporations that are subject to adjudication. If all corporations, including public service corporations and transportation corporations, had been included, the law would have been singularly and obviously incomplete and inefficient, without the addition of many provisions to take care of important situations, for instance one like the present. No petition in bankruptcy was filed against either corporation until after the commence-

ment of the equity suit referred to. The petition in bankruptcy filed against the Empire State Power Company, after the adjudication was opened by this court, was dismissed on evidence taken and the consent of the petitioning creditors.

The bill of complaint was filed, as stated, October 26, 1908, and an order to show cause why receivers should not be appointed issued, and made returnable October 26, 1908. Such order, duly served October 24, 1908, also enjoined and restrained each of said companies, their agents, servants, employés, and officers, from commencing or prosecuting either in the state or United States courts any action or proceeding involving in any way the property or property rights of either of said companies, or incumbering or embarrassing the same. On the 27th day of October, 1908, the day after such order to show cause, etc., was returnable, and several days after its service on the officers of the companies, the board of directors of the Hudson River Electric Power Company had a meeting and adopted the following resolution:

"Resolved, that this company is unable to pay its debts, and for that reason is willing to be adjudicated a bankrupt on that ground.

"Further resolved, that the secretary be authorized to certify a copy of the above resolution for such use as may be required."

A copy was furnished to aid a petition in bankruptcy filed by certain alleged creditors, who thereupon instituted this proceeding. It is based on that resolution and allegation of insolvency. It is evident that some one was endeavoring to thwart the purposes of the suit in equity and interfere therewith, and that the directors either intelligently consented and violated the spirit of the injunction or were induced to take such action ignorantly.

The Hudson River Electric Power Company was incorporated on or about December 28, 1903, under the transportation corporation law of the state of New York, the object of its formation being:

"To maintain, conduct, and manage, in the state of New York and elsewhere, the business of generating, manufacturing, producing, purchasing, selling, transmitting, and dealing in electricity; the use of electricity for light, heat, and power; the carrying on of the business of lighting by electricity, and using it for heat and power, in cities, towns, and villages within this state, and the streets, avenues, public parks, and places thereof, and public and private buildings therein, and for the purpose of such business to generate and supply electricity, and to make, sell, or lease all machines, * * * and to lay, erect, and construct suitable wires and other conductors, with the necessary poles, pipes, or other fixtures, in, on, over, and under the streets, * * * for conducting and distributing electricity," etc.

The evidence gives quite in detail what this corporation actually did, and it may be summarized fairly as follows:

In 1904 and 1905 it constructed a steam electrical plant at Utica, N. Y., for the generation of electricity, and was generating electricity and supplying same to one or more electric railroads. It acquired the site for same, constructed a tower transmission line from Ballston Spa to Amsterdam, N. Y., transmission lines from Utica to Clark's Mills, N. Y., substation building and apparatus at Amsterdam, and electrical machinery and substation or Oriskany, Frankfort, and Little Falls, N. Y., and acquired the Freeman property at Glens Falls to cover and protect water power and lands for a storage reservoir in Scandaga Valley,

N. Y. It has also acquired franchises in Johnstown, Little Falls, Ft. Plain, and Nelliston. This company also acquired and owns all the capital stock of the Hudson River Electric Company, 30,000 shares, 2,108 shares of the capital stock of the Saratoga Gas, Electric Light & Power Company, 7,000 shares of the capital stock of the Ballston Spa Light & Power Company, 2,900 shares of the Empire State Power Company, 47,947 shares of the issue of 50,000 shares of the Hudson River Water Power Company, and the capital stock of the Madison County Gas & Electric Company, 1,820 shares, common stock. In April, 1905, after it had acquired these interests, or most of them, it took over the keeping of the books of all the companies, and its officers became the managing and controlling officers of all the companies.

Considered as a whole, as one corporation and business enterprise, the evidence shows conclusively and beyond all doubt that the principal business was generating electricity and transmitting it to consumers. The Hudson River Electric Power Company had a store in the city of Albany, with two employés, where it kept electrical supplies issued to the other companies as required. This company, from the opening of this supply store in 1905, to November 1, 1908, delivered supplies to the other companies in carrying on the business to the value of $426,376.17, viz.: Hudson River Water Power Company, $8,645.82; Ballston Spa Light & Power Company, $10,764.04; Hudson River Power Transmission Company, $2,301.41; Hudson River Electric Company, $54,102.77; Saratoga Gas, Electric Light & Power Company, $23,728.66; Empire State Power Company, $124,559.01; Madison County Gas & Electric Company, $20,330.06; for its own use, $132,200.68; and for use in general offices of the companies and prorated to all, to the value of $2,261.09. The gross sales and, delivery of electrical energy by the Hudson River Electric Power Company for the 12 months of 1907, from its own plant, were $153,332.96, and for the first 10 months of 1908, $136,945.72. The total gross sales of electrical energy by such company and the subsidiary companies (the others named) for the 12 months of 1907, were $1,124,514.51, and for the first 10 months of 1908, $889,826.85. The Hudson River Electric Power Company owned no gas plant, except in the way mentioned, and in that way controlled the gas plants of the Saratoga Gas, Electric Light & Power Company and the Madison County Gas & Electric Company.

The cost of the Utica plant was $950,000, and of the tower transmission line from Ballston to Amsterdam $250,000, including its other transmission lines. This company was engaged entirely in furnishing the public street lighting and the Utica & Mohawk Valley Railroad Company electrical power. It did no private lighting. Having certain of the farm properties on hand, purchased to gain and control the water powers, it rented some of them, deriving a rental of $1,200 to $1,500 per year. The store in Albany was simply a distributing warehouse. This company, having control of all the companies, and running them as one whole and as a single business, established this to enable it to purchase large quantities of material cheaper than if bought in small lots. When the management put supplies, etc., into the plant of a company, it charged up the cost to that company.

The bankruptcy law (Act July 1, 1898, c. 541, § 4, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423], as amended by Act Feb. 5, 1903, c. 487, § 3, 32 Stat. 797 [U. S. Comp. St. Supp. 1907, p. 1025]) provides:

"Who may Become Bankrupts. (a) Any person who owes debts, except a corporation, shall be entitled to the benefits of this act as a voluntary bankrupt.

"(b) Any natural person, except a wage earner, or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act. Private bankers, but not national banks or banks incorporated under state or territorial laws, may be adjudged involuntary bankrupts.

"The bankruptcy of a corporation shall not release its officers, directors, or stockholders, as such, from any liability under the laws of a state or territory or of the United States."

If we assume that generating electricity is manufacturing, and that transporting and selling it is a mercantile pursuit, we may say that this company was engaged principally in manufacturing and mercantile pursuits and is subject to be adjudicated a bankrupt, if public service corporations of this kind are subject to the law at all. I am of the opinion that generating electricity is not manufacturing, and that transmitting electricity over lines of wire to the consumer and delivering it for a consideration is not a mercantile pursuit, within the meaning of the bankruptcy act.

Electricity is a force of nature; but, so far as I know, or am informed, no one is able to take materials and by combining them and operating on them, producing chemical changes or otherwise, produce therefrom electricity. We are able to gather it, store it temporarily, measure it, apply it by mechanical means, cause it to run in currents, and by interfering with such currents cause great heat and light, and exert mighty force in moving machinery and railroad trains, etc. But, so far as known, we cannot manufacture it. If by means of exciters, generators, so called, etc., operating by steam engines heated by coal or wood, we get electricity, we obtain the same result when we operate all these by water power or any other power. We do not transform anything used in generating electricity into electricity. The coal is burned in running the machinery; but it is not, nor is any part, converted into electricity. The water turns the wheels, but passes on without diminution or change. Do we gather it from the air or from the earth? If so, we simply separate a force of nature, an existing material, it may be, from other material things with which it is mixed, or by which it is surrounded, and then confine, store, measure, and use it. We do not manufacture it. So far as known, we do not change its form in any way. Its shape, form, constituent elements, abiding places, are unknown. We know some of the things it will do, its manifestations. We generate, but do we manufacture, electricity?

Gathering electricity from earth or air is like mining, but not mining. In mining coal, or lead, or gold, or silver, we find these things in the earth, surrounded or mixed with many other things. We separate the coal or metal from its surroundings by digging, picking, by

the application of water or mechanical means, and so gain control of the unmixed coal or metal; but we do not manufacture it. This was decided by the courts, and thereupon the bankruptcy law was amended, by expressly including mining corporations in the section quoted. This was a legislative declaration that to do what I have described is not manufacturing, within the meaning of the law. Within the authorities the generating of electricity is not manufacturing. People ex rel. v. Roberts, 145 N. Y. 375, 377, 40 N. E. 7; People ex rel. v. Roberts, 155 N. Y. 408, 411, 50 N. E. 53, 41 L. R. A. 228; Webster's Dictionary, "Manufacturing;" Lawrence v. Allen, 7 How. 785, 12 L. Ed. 914; Tidewater Oil Co. v. U. S., 171 U. S. 210, 216, 18 Sup. Ct. 837, 43 L. Ed. 139; Com. v. Northern Elec. Co., 145 Pa. 105, 22 Atl. 839, 14 L. R. A. 107; Com. v. Edison, etc., Co., 170 Pa. 231, 32 Atl. 419; People v. Knickerbocker Ice Co., 99 N. Y. 181, 1 N. E. 669; Collier on Bankruptcy (7th Ed.) 104, 105; Byers v. Franklin Coal Co., 106 Mass. 131; Butt v. Construction Co., 15 Am. Bankr. Rep. 515, 140 Fed. 840, 72 C. C. A. 252; Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012.

If it be true, as said by Mr. Justice Brown, in Tidewater Oil Co. v. U. S., 171 U. S., at page 216, 18 Sup. Ct., at page 839 (43 L. Ed. 139), that:

"The primary meaning of the word 'manufacture' is something made by hand, as distinguished from a natural growth; but, as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose, from the original materials; and usually it is given a different name. Raw materials may be, and often are, subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product,"

—and, as said by Bartlett, J., in giving the opinion of the Court of Appeals of the state of New York, in People ex rel. v. Roberts, 145 N. Y., at page 377, 40 N. E., at page 8, that "the process of manufacture is supposed to produce a new article by the application of skill and labor to the raw material," and the gathering, storing, preserving, and preparing for market natural ice is not manufacturing, or, as said by Webster, in substance, that a manufacture—that is, the result of manufacturing—is "anything made from raw materials by the hand, by machinery, or by art, as clothes, iron utensils," etc., and that shells cleaned by acid, then ground on an emery wheel, and some of them then etched by acid, and all intended to be sold as ornaments, are not a "manufacture of shells," as was held by the Supreme Court of the United States in Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012, it is impossible to hold, under the evidence in this case—that of the witness John D. Hilliard, conceded to be a competent electrical expert—that generating electricity is manufacturing. What is the raw material operated upon, and how is anything that goes into or makes the electricity changed in form? Who knows what electricity is composed of? The witness said he did not, that he could not give a chemical analysis of electricity, does not know of any one who can, and that there is no book that tells. He does say:

"The energy of the combustion of the coal is transformed into electrical energy through the medium of the expansion of the steam in the steam engine and the passage of the magnetic field by the armature bars."

But this fails to make electricity a manufactured product. Later he said that all the coal does is to make power to turn the wheel of the engine, which turns the wheels of the electrical machinery, and that it makes no difference whether the machine that produces the power is a steam engine, a water wheel, or a windmill. It is true that in People ex rel. v. Wemple, 129 N. Y. 543, 29 N. E. 808, 14 L. R. A. 708, the Court of Appeals of New York held that a domestic corporation organized under the general manufacturing act, engaged in producing electricity and supplying it to customers, was a manufacturing corporation within the meaning of that act, exempting manufacturing corporations from taxation until 1889, when electric lighting companies were taken out of the exemption clause. It would be tedious to quote the opinion in that case and point out the process of reasoning upon which the court proceeded. It is sufficient to say that it is clear the case is not authority for holding these companies to be "manufacturing companies," within the meaning of the bankruptcy act.

But it is said this corporation, the Hudson River Electric Power Company, was engaged principally in a mercantile pursuit. It was transmitting and selling electricity, or electrical power, more properly, and also furnishing to the so-called subsidiary companies electrical supplies of all kinds. But there was no sale by this company or purchase by the others. Having gained control, this company supplied all the companies so controlled, ran their business as its own, and kept track of what was earned by each, or the plants of each, and what it cost to operate them, and the supplies, etc., furnished. This was not a mercantile pursuit. So, transmitting and disposing of the electrical energy, as this was done, was not a mercantile pursuit, within the meaning of the bankruptcy law. Furnishing these supplies in its own business, which it was conducting, and using them to keep the various plants in operation, while charged up to the accounts of the respective companies, did not make this corporation a mercantile corporation, or this a mercantile pursuit. A corporation is engaged in cutting timber and logs from its own lands, transporting them to market, and delivering them to its customers, with whom it has special contracts. Is this a mercantile pursuit? I think not, in the ordinary meaning of the word, and certainly not within the meaning of the bankruptcy act. Is a farmer who raises produce on his own farm for the market, as all do, produces milk, butter, or cheese from his dairy for sale, and who sells same to special customers, engaged in a mercantile pursuit, or in trading, within the meaning of the bankruptcy act? I think not. Zugalla v. International Mercantile Agency, 16 Am. Bankr. Rep. 67, 142 Fed. 927, 74 C. C. A. 97. These persons are not engaged in buying and selling commodities.

The attorney for the petitioning creditors contends in his brief that "this corporation was organized to engage in manufacture, trade, and commerce." I do not so understand. He cites one case only to sustain his contention that this is a manufacturing and trading corporation, that of Re Tecopa Mining & Smelting Co. (D. C.) 110 Fed. 120.

If in smelting we simply separate the gold, or silver, or copper, from its surroundings, the material with which it is mixed, by melting the ore. I question whether it is engaged in manufacturing within the meaning of the law. But it is unnecessary to question or discuss the authority of that case. Clearly we do not, so far as appears, produce, or liberate, or gather, electricity by smelting or any similar process.

It is contended that this corporation committed an act of bankruptcy, in that on the 31st of October, 1908, receivers were appointed and put in charge of its property by the Circuit Court of the United States in the equity action mentioned, on charges of insolvency, mismanagement, etc., and that such receivership was not terminated, etc. This is denied by the opposing parties. That suit is at issue, but has not been tried. No judgment has been pronounced. No adjudication of insolvency has been made. The receivers were appointed, and are in possession of the property, to protect and preserve it pendente lite, not as owners, and were appointed under the general equity powers of the Circuit Court of the United States. Within the authority of Zugalla v. International Mercantile Agency, 16 Am. Bankr. Rep. 67, 142 Fed. 927, 74 C. C. A. 97, this was not an act of bankruptcy.

By resolution, after the commencement of that suit and the service of the injunction, the board of directors, as stated, adopted a resolution confessing its inability to pay its debts and signifying its willingness to be adjudicated a bankrupt on that ground. When that resolution was adopted the Circuit Court of the United States had taken jurisdiction, issued an order to show cause why a receiver should not be appointed, and enjoined the directors of the company from commencing or prosecuting any proceeding "involving in any way the property or property rights of either of said companies, or incumbering or embarrassing the same." The adoption of this resolution was, as stated, the very foundation of the bankruptcy proceedings, which sought to, and in their effects, if carried on, would, take the property of the corporation from the hands and control of the Circuit Court. Thus would necessarily arise, as there has arisen, a conflict of jurisdiction between the Circuit Court of the United States and the District Court of the United States sitting and acting as a court of bankruptcy. This act of the directors clearly was a step, and a necessary step, in the commencement of a proceeding which "involved" the property of the corporation and "embarrassed" the same.

I am of the opinion, and hold, that under such circumstances and conditions the act of the board of directors was an unauthorized act, invalid, and not an admission by the corporation constituting an act of bankruptcy. "Where the bringing or continuing of legal proceedings is prohibited by injunction, any steps, although merely preliminary or incidental, taken for the purpose of bringing or continuing such proceedings, constitute a violation of the injunction." Before any adjudication could be made, the Circuit Court had taken actual possession of the property, and now has such possession. If the commencement of such an equity suit as mentioned in the Circuit Court of the United States for such a purpose and the proceedings taken constitute an act of bankruptcy, which, taken advantage of by other creditors, aided

by the directors under injunction, result in ousting the Circuit Court of the United States, we have an anomalous situation.

In such .a case as this, or these eight corporations in all, only five involved in the various bankruptcy proceedings, there is every reason for holding that the jurisdiction and control of the Circuit Court should not be ousted or superseded by the bankruptcy proceedings. At the time the equity suit was commenced, the eight were being conducted as one. It was not a merger or a monopoly, but was done for the benefit and advantage of all. The Circuit Court has determined that the business should be continued, and the same is being continued as one business; the accounts being kept separate. With one receivership, and in one proceeding, the affairs of the eight corporations can be wound up, the creditors ascertained, their rights adjusted and protected, and the property sold and distribution made. In bankruptcy we must have eight separate proceedings before possibly (and probably) eight referees, with eight (and it may be twenty-four) trustees, and at least eight sets of attorneys representing them. I can see no end to the complications that would arise in such event.

Again, the powers of the Circuit Court as a court of general jurisdiction, with broad equity powers, having control of all intervening suits affecting the property, are much more ample and efficient in such a situation. Considering all this, it seems to me clear that the law will not sanction or permit adjudications in bankruptcy against these corporations, based on the voluntary acts of their boards of directors, respectively, when under the injunction of the Circuit Court of the United States prohibiting them from instituting any proceeding which would involve the property or property rights of either of these corporations or embarrass same. It cannot be that such acts, which plainly violate the injunction of the court, are valid and binding on the court. For this court to recognize the validity of such acts of the directors, and enforce them, would be to aid and make effectual their violation of the injunction of the Circuit Court. An injunction must be obeyed in its spirit as well as its letter.

Without taking time or space to cite all the authorities, attention is called to the rules of law as stated in 22 Cyc. 1016, 1017, 1025, and the many cases there cited. .It is there said:

"Acts Constituting Evasion.—(a) In General. No subterfuge, amounting to a substantial violation of an injunction, will be allowed to succeed simply because not contrary to the letter of the prohibitory clause. * * *

"Particular Acts.—(a) Bringing or Continuing Legal Proceedings. Where the bringing or continuing of legal proceedings is prohibited by injunction, any steps, although merely preliminary or incidental, taken for the purpose of bringing or continuing such proceedings, constitute a violation of the injunction.

"Undoing the Wrong. Where defendant has interfered with property in violation of an injunction, he may be required to restore the property to its former condition."

And in Seligson v. Collins; 64 Tex. 315, it was held that:

"An execution * * * issued in violation of a pending injunction is void, and will not support a title made under it."

The same is held in Morris v. Bradford, 19 Ga. 527, and Farnsworth v. Fowler, 1 Swan (Tenn.) 1, 55 Am. Dec. 718. In Byne v. Byne, 54

Ga. 257, defendant took possession of land in violation of an injunction, and the court directed the sheriff to restore the possession.

If necessary, I think a contempt proceeding against all such directors would lie, and that the Circuit Court would have power to compel them to assemble and rescind such resolutions, adopted in the very face of the injunction. But I do not think that necessary, as the Circuit Court, having possession of all the property and jurisdiction of all the parties, may protect that jurisdiction and possession; and this court, fully informed of the facts by the record before it, should take no step in recognition or aid of acts violating the order of that court. In Ex parte Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689, the court, by Mr. Chief Justice Fuller, pointed out distinctly the jurisdiction and power of a court where a receiver has been appointed. He said:

"No rule is better settled than that, where a court has appointed a receiver, his possession is the possession of the court, for the benefit of the parties to the suit and all concerned, and cannot be disturbed without the leave of the court, and that, if any person, without leave, intentionally interferes with such possession, he necessarily commits a contempt of court, and is liable to punishment therefor."

Here we have no conflict between the courts of the United States in bankruptcy and the state courts, where, in such matters, the laws of the United States are paramount, but one between different courts of the United States, both acting under the Constitution of the United States and the laws of Congress enacted by virtue thereof. It seems to me that a decent respect for the authority of the Circuit Court demands that the District Court, acting as a court of bankruptcy, refrain from recognizing and enforcing acts of parties within its jurisdiction done in violation of the orders of that court. If where parties have interfered with property, or done acts which, if recognized as valid, will interfere with property, in violation of an injunction, they may be required to restore the property to its former condition (see authority cited, and In re Fortunato, 123 Fed. 622, 625; 1 Beach on Injunctions, p. 291, § 281; Woodley v. Boddington, 9 Simons, 214; Daniel v. Ferguson, 2 Ch. 27), it seems to me that a court of concurrent jurisdiction in some matters, but subordinate in others, advised of the facts, may refuse to recognize such acts, and thus refuse to consummate the injury against which the injunction was directed. If such acts are void, as was held in Seligson v. Collins, Morris v. Bradford, and Farnsworth v. Fowler, supra, that ends the contention, and this court is bound to regard the resolutions referred to as void and of no force.

We come, then, to consider the facts in the other cases, regarding the other corporations, involved here, that we may see how far they are within the propositions stated and decided.

## Hudson River Electric Company.

This is one of the defendants in the equity suit referred to. The corporation was organized under the transportation law of the state of New York, and the purposes of its organization, as recited in the articles of incorporation, are substantially the same as those recited in

the case of the Hudson River Electric Power Company. It is not necessary to quote them. This company has not, however, engaged in the generating or collection of electrical energy, and had no plants or facilities for so doing, but has confined its operations exclusively and wholly to the transmission and distribution of electrical energy or electricity. It cannot be claimed, therefore, that it is a manufacturing corporation, or one engaged in manufacturing. It has franchises from some fifteen towns and villages, including two or more cities. Under them it was given power to erect and maintain necessary poles and wires, and other structures necessary, over, upon, and along public streets and highways, for the transmission and distribution of electrical power, and has done so in certain places. Its distribution has been to towns and villages and cities, and the inhabitants thereof, and to companies running cars. It is decidedly a public service corporation in its actual business. It has purchased its electrical power from the Hudson River Water Power Company, Hudson River Power Transmission Company, and the Kane's Falls Electric Company. During the first ten months of the year 1908 there was furnished to said company the following:

By Hudson River Water Power Company................5,411,222 K. W. H.
By Hudson River Power Transmission Company.......... 85,907 K. W. H.
By Kane's Falls Electric Company.................... 396,975 K. W. H.

　　Total .........................................5,894,104 K. W. H.

The rate paid therefor was one cent per K. W. H., or $58,941.04. This was distributed to 1,694 customers over overhead distribution system at Watervliet; overhead and underground system at Glens Falls; overhead system at Green Island and Lake George; transmission lines, pole 166, to Watervliet; Watervliet to Troy, Watervliet to Lathams, Lathams to Ludlen S. & S. Company, and Geyser Station to Hudson River Railway Company line; one circuit on Hudson River Power Transmission Company poles, Alplaus to Schenectady, and two circuits on same, Watervliet to Albany; also an underground system in the city of Albany. It had a substation, site building, and electrical apparatus at Glens Falls, N. Y., at Watervliet, N. Y., at Cohoes, N. Y., Albany, N. Y., Ballston, N. Y., and switch house sites at Alplaus, N. Y., and Saratoga, N. Y., and other small properties. During the first ten months of the year 1908 the gross earnings of the Hudson River Electric Company for electrical energy delivered was as follows:

Light, public and private..................................... $ 39,184.43
Power, public and private.................................... 59,354.01
Municipal street lighting, arcs.............................. 12,458.35
Municipal street lighting, incandescent..................... 13.60

　　Total ......................................................$111,010.39

There was a contract between the Hudson River Electric Company, the Hudson River Water Power Company, and the Hudson River Power Transmission Company to furnish electrical energy to the General Electric Company at Schenectady, N. Y., and during the first ten months of 1908 the Hudson River Electric Company furnished energy

under that contract that was not paid for to the amount of $260,000 or $270,000. This company also sold electrical supplies and wired houses for electricity at Glens Falls, Watervliet, and Cohoes, maintaining a store at each of these places. The gross sales during the time mentioned was $8,484.22, including charges made for wiring done by the company. The Hudson River Electric Company also owns the stock of the Hudson River Power Transmission Company. The stores mentioned were, in reality, depots of supplies used as follows: When the company secured a new customer for electrical energy, or light, or power, it wired his building or buildings, putting in the necessary fixtures, taking the material from its stores or depots. Thereafter the customer, if he desired, could get new or additional supplies from the same place. But very little was sold to outsiders.

The question presented is: Was this company engaged principally in trading or mercantile pursuits, within the meaning of the bankruptcy law? It, of course, first purchased its materials and supplies. It purchased its electrical energy or electricity, the terms being used synonymously. It transported it by electrical lines of vast extent to distributing points. It had distributing points and machinery for making distribution, and it distributed it by transportation on lines of wire, etc., over a vast area of country, as well as over thousands of miles of streets and avenues in cities and villages. In view of many authorities, especially In re New York & New Jersey Ice Lines, 147 Fed. 214, 77 C. C. A. 440, and In re Wentworth Lunch Co., 159 Fed 413, 86 C. C. A. 393, decided by the Circuit Court of Appeals in the Second Circuit, and Zugalla v. Int. M. Agency, 16 Am. Bankr. Rep. 67, 142 Fed. 927, 74 C. C. A. 97, and In re New York & W. Co. (D. C.) 98 Fed. 711, as well as on general principles, I must hold that this corporation was not engaged principally, if at all, in trading or commercial pursuits, within the meaning of Bankr. Act July 1, 1898, as amended, and is not, therefore, subject to be adjudicated a bankrupt. Really, its main and principal business was that of transporting electrical power, although the evidence does not point out this fact clearly, by showing the cost or value of the transportation lines and the cost of operating same. It does show purchases by this corporation in 1908 of electrical power at a cost of $58,941.04, and a sale thereof, transported and delivered, for $111,010.39 generally, and $260,000 additional to the General Electric Company, or $361,010.39 in all.

It is argued by the attorney for the petitioning creditors that transportation companies may be adjudicated bankrupts; but, in view of the fact that the bankruptcy act itself points out and names the particular classes of corporations that may be adjudicated bankrupt, I am quite clear that all others are excluded. I know of no principle of law that will permit their inclusion in the list, unless actually engaged principally in manufacturing, trading, or mercantile pursuits. This has been many times decided.

### Hudson River Power Transmission Co.

This, also, is one of the defendants in the equity suit referred to. It was incorporated under the transportation law of the state of New York. Its plant is situated at Mechanicsville, N. Y., on the Hudson

river, in the town or village of Half Moon Bay. The corporation owns a water power plant, with steam auxiliary, for the purpose of generating electricity or electrical power, and that is the business done at the plant. It also owns transmission lines, for transmitting electrical power, extending from Mechanicsville to Alplaus, and from Alplaus to the Mohawk river at Schenectady, from Mechanicsville to Watervliet, and from there to the city of Albany. During the year 1898 the power generated at this plant was delivered to the United Traction Company, running electrical street cars, the Albany Electric Illuminating Company, and the Troy Gas Company, and a few other customers, for the account of the Hudson River Electric Company, which company received all the moneys for all the power mentioned. Its stock was owned by that company, whose officers managed it and its business. This corporation has numerous franchises for its various lines for crossing and passing on public streets and highways. The Albany Electric Illuminating Company furnishes light and power both to the public and private individuals in the city of Albany, and, as stated, the traction company runs street cars in Albany, Troy, Cohoes, and Watervliet. In short, the Hudson River Power Transmission Company is a public service corporation. It made reports to the Public Service Commission. There were no contracts between the Hudson River Electric Company and the Hudson River Power Transmission Company. The said electric company furnished supplies to the said transmission company, but charged up in the accounts no profit—simply the amount it paid for them. The purposes of the organization of the said transmission company were:

"The development, use, sale, and transfer of electrical power, light, and heat, and, for the purpose of producing and generating such power, light, and heat, the construction, operation, and use of a dam or dams in the Hudson river and elsewhere, and also, in connection with such purposes, the construction, operation, and use of power houses, plant, machinery, buildings, mills, factories, and such other structures or means as may be desirable or necessary for the development, use, sale, and transmission of power, light, and heat as aforesaid."

It is about 14 miles from Mechanicsville to Albany by way of Watervliet, and 17 miles from Mechanicsville to Schenectady. The evidence shows that the Hudson River Power Transmission Company was engaged principally in transporting—transmitting—electrical power and delivering it to municipal corporations for power and light and to a railroad or traction company running cars for the accommodation of the public in and between these cities, as well as other places. I hold that it was not engaged principally in manufacturing, trading, or mercantile pursuits, within the meaning of the bankruptcy act quoted from.

It is urged that the petition cannot be maintained, for the reason it is not filed by three creditors of the Hudson River Power Transmission Company. I think this contention is sustained by the evidence. The petition was filed November 4, 1908, by the Ludlow Valve Manufacturing Company, claiming to be a creditor to the amount of $270 for goods, wares, and merchandise alleged to have been furnished in 1908, the Knowlson & Kelley Company, claiming to be a creditor to the amount of $235 for goods claimed to have been furnished the same

year, and Charles E. Hurd, claiming to be a creditor to the amount of $90.40 for goods, wares, and merchandise sold the same year. Notice was duly given to these alleged creditors to produce their books, etc., showing their dealings with the transmission company, if any, and showing their sales, etc., of the goods mentioned in their claims. They failed and declined to produce them, and gave no valid or satisfactory reason for not producing them. The claim is that the goods, etc., were ordered by, sold, and delivered to the Hudson River Electric Power Company, the managing and controlling company, and on its credit, and not to the transmission company, although used for the running of the business at the plant of that company.

The petitioners claim that the goods, wares, and merchandise were ordered and purchased, in fact, by the Hudson River Electric Power Company as a mere "purchasing agent" of the transmission company, and for it, and that the transaction was actually between the vendors, the petitioners, and the transmission company acting through its "purchasing agent." If this is true, the petitioners have a claim, undoubtedly, against the transmission company. The only foundation of this claim is that the goods were ordered and the purchases were made as follows: First, at the station or plant where the supplies or goods were required for use, the servant, employé, or officer of the Hudson River Electric Company, the controlling company, having the matter in charge for that company, and under its control and direction, would make out a requisition, stating what was wanted and where, and sign same. This would be marked "O. K." by another employé, and thereupon an order would be sent to the person or firm or company from whom the purchase was to be made. These orders read as follows, omitting unnecessary language:

"Purchasing Department, Hudson River Electric Power Company,
Albany, N. Y.
"Glens Falls, N. Y., [date].
"[Address]: Send us for (plant or place and description of property).
"Yours truly,     Hudson River Electric Power Co., Purchasing Agent."

There was no direction to send the goods ordered for or on account of the Hudson River Power Transmission Company. On receipt of the order, the petitioner the Ludlow Valve Manufacturing Company answered to the Hudson River Electric Power Company, in the case of the item claimed, $253.88, of July 13, 1908, as follows:

"Troy, N. Y., May 27, 1908.
"Gentlemen: We acknowledge receipt of your order No. B-5781, and will make complete shipment on or before June 20th. Our shop order No. 306.
"Sturgess Engineering Dept.
"The Ludlow Valve Mfg. Co.
"Hans Schwartz."

The said goods were sent about July 13th, with the following bill:

"Sturgess Engineering Dept., Trade-Mark Ludlow.

"The Ludlow Valve Mfg. Co.: [Description of goods dealt in, and directions as to receipt, etc.] Office and Works, Foot of Adams St.,
"Troy, N. Y., U. S. A., July 13, 1908.

"Sold to Hudson River Elec. Pr. Co., Glens Falls, N. Y.
[Description of goods and value]..................................$253.88."

The same form of order and the same bills in form, etc., were sent in case of the two other items. There had been many other purchases of this company made in the same way, and payment had been made by checks of the Hudson River Electric Power Company, not by the check of the transmission company. There is no evidence that the Hudson River Electric Power Company was the agent of the transmission company. It owned the stock of that company, and by its officers ran its business, as it did that of the six other corporations, having gained control by ownership of stock. So far as appears, the directors and officers of the transmission company had nothing to do with these purchases. The Ludlow Valve Manufacturing Company, so far as appears, had no knowledge or information of the relation of these corporations. Clearly it gave credit to and charged the goods to the Hudson River Electric Power Company, and clearly that company recognized the transaction as a sale to it and on its account, and acknowledged it had purchased the goods of the valve company, and recognized the valve company as its creditor. The one corporation was not the agent of the other. Const. Co. v. Richmond, etc., R. Co., 68 Fed. 105, 108, 15 C. C. A. 289, 34 L. R. A. 625, cited and approved in Re Watertown Paper Co. (C. C. A., 2d Circuit) 169 Fed. 256. In that case it is held:

"Neither does the fact that the one corporation exercised a controlling influence over the other, through the ownership of its stock, or through the identity of stockholders, operate to make either the agent of the other, or to merge the two corporations into one."

Great stress is laid upon the use of the words "Purchasing Agent." The petitioners claim that they necessarily imply a principal for whom the agent was acting, separate and distinct from the agent; that, as a corporation cannot be an agent for itself, the necessary legal inference is that the Hudson River Electric Power Company, in purchasing these goods, was acting as the agent for a principal, the Hudson River Power Transmission Company, inasmuch as the goods were directed to be shipped to that company at Mechanicsville. As all this appeared on the face of the order, it seems strange, if the contention be correct, that the valve company did not so understand and bill and charge the goods to the transmission company. But it did not, and it is evident that the seller did not understand the words "Purchasing Agent" as indicating or connoting any agency of the kind mentioned. It is evident the valve company understood the words correctly, and as implying, as the fact was, that the Hudson River Electric Power Company was the efficient cause, the corporation having the power to act, the acting corporation. See primary meaning of "agent," Century Dictionary, "Agent."

Among all the eight corporations this was the only active one. The use of these words properly gave notice to the world which was the acting and active corporation, and did not necessarily imply that it was acting as the agent for the others or for either of them. The same facts substantially obtain regarding the claim of Knowlson & Kelley Company. I must hold, under the evidence, that neither Ludlow Valve Company nor Knowlson & Kelley Company are creditors of the Hudson River Power Transmission Company.

## Saratoga Gas, Electric Light & Power Company.

For brevity, this corporation will be referred to as the Saratoga Company. The petition was filed against it on the 4th day of November, 1908, four days after it had passed into the possession and under the control of the receivers appointed in the equity suit before mentioned. On the 2d day of November, two days thereafter, and with the injunction first granted and that contained in the order appointing the receivers in full force, the directors of this corporation held a meeting and adopted a resolution, viz.:

"Meeting of the board of directors of the Saratoga Gas, Electric Light & Power Company, held at the office of the company on the 2d day of November, 1908.

"Mr. Ashley in the chair. Present: Elmer J. West, Patrick F. Roohan, Charles E. Parson, Harry B. Austin.

"On motion, duly made, seconded, and carried, it was resolved, that this company is unable to pay its debts, and for that reason it is willing to be adjudicated a bankrupt upon that ground. It is further resolved, that the secretary be authorized to certify a copy of this resolution for such use as may be required.

"Meeting adjourned.                     H. B. Austin, Secretary."

This company is engaged in making gas, and has, or had, an electrical plant, and is engaged in transmitting or transporting and furnishing both gas and electricity for lighting the streets, avenues, public parks, and public and private buildings of the village and town of Saratoga Springs, N. Y., and has laid and erected and constructed suitable wires and conductors, and pipes, gas mains, etc., for conducting and transmitting both gas and electricity in, on, and over the public streets, etc., of such village and town, as specifically authorized by its articles of incorporation to do. We have questions involved here not presented in the cases already considered. This corporation is one of the eight defendants in the equity suit named. Its stock is owned or controlled by the company before named. It has a contract with the village for lighting its streets. The electrical transmission wires are on poles, of which there are 1,400, and cover all the principal streets and alleys of the village. There are some 25 miles of gas mains. Some of the public buildings and places are lighted with gas. The proof shows, and it has been also judicially decided, that this corporation is engaged in the public service, and is amenable to the supervision and authority of the Public Service Commission. Village of Saratoga Springs v. Saratoga Gas, Light & Power Co., 191 N. Y. 123, 83 N. E. 693, 18 L. R. A. (N. S.) 713. It obtains its electrical power from the Hudson River Water Power Company, one of the defendants in the equity suit mentioned. In 1907 its electrical earnings were $68,594.76, while its gas earnings were $64,111.70. In 1908, up to the receivership, its electrical earnings were $49,458.84, and its gas earnings $47,321.91. It also had a supply store of the same description and used for the same purposes as those already mentioned in the case of the Hudson River Electric Company, but includes gas pipe and fixtures. It furnished from this store in 1907 $15,367.72, and in 1908 $6,024.89, of electric and gas appliances and supplies to its customers. This, of course, is a

mere incident to its main business, and does not change its general character. Taking the figures, it is evident that the principal business of this corporation has been and is that of transmitting and supplying electricity or electric power. It manufactures gas, and when that gas was transported to the consumers the receipts therefor in 1908 were $47,321.91.

The corporation (doing business under the management and control of the other company, heretofore named) was organized under and pursuant to the transportation laws of the state of New York. Its articles of incorporation so state, and this fact was admitted. It may be conceded that a corporation engaged solely in the making of gas for illuminating purposes is engaged in manufacturing; that is, that making gas is manufacturing. But when to this we add the transportation thereof, and the business of purchasing, transporting, and supplying electrical energy, which electrical business exceeds in volume and revenue the gas business, it becomes clear that the corporation is not principally engaged in manufacturing. Is it engaged principally in trading or mercantile pursuits, within the meaning of section 4 of the bankruptcy act quoted? I cannot reconcile in my own mind or judgment the idea of such a business being either "trading" or a "mercantile pursuit." A transportation corporation, if transportation be its principal business, is not amenable to the bankruptcy law. In re New York & Westchester Co. (D. C.) 98 Fed. 711. That corporation was engaged in gathering, storing, and supplying, through water mains, watersheds, reservoirs, and pipes, water to both the public authorities and private individuals. Water companies, as is well known, may purchase water rights, and even water, for emergencies. Water is not generally regarded as a commodity, commercially speaking. But why is it any less a commodity than gas or electrical power? Illuminating gas and electrical power are found in large quantities in nature; gas in many localities, electricity everywhere. If the generation of electricity is but the gathering of it from earth or air, it is no more manufacturing than the gathering of water. As both are sold to individuals and the public for public uses and to subserve the wants of man, the one is as much an article of trade and commerce as the other. Bouvier thus defines "merchandise":

"Merchandise (Lat. merx). A term including all those things which merchants sell, either wholesale or retail, as dry goods, hardware, groceries, drugs, etc. It is usually applied to personal chattels only, and to those which are not required for food or immediate support, but such as remain after having been used, or which are used only by a slow consumption. See Pardessus, n. 8; Dig. 13, 3, 1; 19, 4, 1; 50, 16, 66; 8 Pet. 277; 6 Wend. (N. Y.) 335. Mere evidences of value as bank bills, are not merchandise. 'The fact that a thing is sometimes bought and sold does not make it merchandise.' Story, J., 2 Story, C. C. 10, 53, 54. See 2 Mass. 467; 20 Pick. (Mass.) 9; 3 Metc. (Mass.) 367; 2 Parsons, Contr. 331, note 'w.' "

The Century Dictionary thus:

"In general, any movable object of trade or traffic; that which is passed from hand to hand by purchase or sale; specifically, the objects of commerce; a commercial commodity or commercial commodities in general; the staple of a mercantile business; commodities, goods, or wares bought and sold for gain."

The Century Dictionary defines "merchant" as:

"One who is engaged in the business of buying commercial commodities and selling them again for the sake of profit, especially one who buys and sells in quantity or by wholesale. One who buys without selling again, or who sells without having bought, as where one sells products of his own labor, or who buys and sells exclusively articles not the subject of ordinary commerce, or who buys and sells commercial articles on salary, and not for profit, is not usually termed a merchant."

So making and selling illuminating gas is not, in my judgment, trading or a mercantile pursuit, especially when made by a gas company and sold, not generally to all the world, but to special customers in a restricted area, and is transported to those users through mains and pipes in such a way that the value of the transportation and cost of transportation is as great or greater than the mere production. The statutes of the state of New York seem to recognize and really define such a corporation as this as one engaged principally in transportation, and not in manufacture. By chapter 566, p. 1136, Laws 1890, known as the "Transportation Corporation Law," special provision is made for the incorporation of gas and electric companies engaged in public and private lighting. Section 60 of article 6 reads:

"Incorporation. Three or more persons may become a corporation for manufacturing and supplying gas for lighting the streets and public and private buildings of cities, villages or towns in this state, or for manufacturing and using electricity for producing light, heat or power and in lighting streets, avenues, public parks and other places and public and private buildings of cities, villages and towns within the state, or for two or more of said purposes, by making, signing, acknowledging and filing a certificate stating the name of the corporation, its objects, the amount of its capital stock, the term of its existence, not to exceed fifty years, the number of shares of which the stock shall consist, the number of directors (not less than three nor more than thirteen), the names and places of residence of the directors for the first year, and the names of the towns, villages, cities and counties in which the operations of the corporation are to be carried on; and thereupon the persons who shall have signed the same, their associates and successors shall be a corporation by the name stated in the certificate."

This fact is not conclusive of course; but it is significant.

The effect of the resolution of the board of directors, relied upon as an act of bankruptcy, has been already considered. Here the board of directors took this action after the actual possession and control of the property had passed into the hands of the Circuit Court under the following additional injunction, viz.:

"And said defendant Saratoga Gas, Electric Light & Power Company, and each and every of its officers, directors, agents, and employés, and all other persons whomsoever, are hereby ordered and directed forthwith to deliver up to said receivers possession of all and every part of the property of the said defendant company, together with all books of account, vouchers, records, correspondence, and documents of the said defendant company.

"And the said defendant, and each and every of its said officers, directors, agents, and employés, and all other persons whomsoever, are hereby enjoined and restrained from disposing of any of the property or moneys of the said defendant company, or from taking possession of, levying upon, or attempting to sell in any manner any of the property of said defendant, or from interfering with the possession of the receivers hereby appointed, or with the discharge of their duties as such receivers. * * *

"That said receivers shall have full power and authority, and are hereby directed, to manage and operate the said several defendant companies and

their respective businesses, so far as possible, and, so far as is consistent with the proper separation of their several respective properties, assets, receipts, accounts, and disbursements, to so operate said several companies as a single unified system, and in such manner as to carry out their several respective public duties, and so far as possible to carry on their said several businesses, to fulfill their said several contracts and obligations in such manner that the several cities and towns which are dependent upon said defendant companies for light, heat, and electrical railway service, and for water supply, shall continue to receive the same, and so that all said public services shall be fully and effectively performed.

"And the said defendant companies, and their several officers, directors, attorneys, agents, and employés, and all other persons, are each and all hereby restrained and enjoined from in any manner interfering with the performance of such public services, and from interfering in any manner with the same, or with the operation of said receivers in the manner hereinbefore set out, whether under this or the previous paragraphs of this decree."

It seems to me clear that the resolution quoted cannot, under such circumstances, be regarded as an act of bankruptcy by the corporation. The reasons have been fully stated.

## Madison County Gas & Electric Company.

This is one of the eight defendant corporations in the equity suit referred to, is a public service corporation organized under the said transportation corporation laws, and, after the service of the injunctions mentioned on Mr. West, its treasurer, and the appointment of the receivers, its board of directors passed a resolution acknowledging its inability to pay its debts and signifying its willingness to be adjudged a bankrupt on that ground. It has a plant at Oneida, N. Y., where it makes gas and generates electricity, and under contract furnishes both to the city of Oneida and the villages of Canastota and Oneida Castle, and their citizens, for both public and private use.

In 1907 the total gross earnings of the corporation from its electrical business was............................................. $43,791 50
And first nine months of 1908 was............................... 29,117 56
                                                               _____
    Total electrical earnings......................... $72,909 06

In 1907 the total gross earnings of this corporation from its gas business was................................................. $12,216 16
First nine months of 1908 was.................................. 9,580 05
                                                               _____
    Total gas earnings.................................. $21,796 21

In addition it ran two supply stores, of the same character before mentioned, and it supplied to parties other than the company itself in 1907 gas and electric supplies to the amount of $4,859.61, and during the first nine months of 1908 to the value of $3,760.49. It is self-evident that the principal business of this corporation was generating, transporting, and delivering electrical power for a consideration. It is clear that this corporation was not engaged principally in manufacturing, trading, or mercantile pursuits, if I am correct in my former conclusions, and is not subject to be adjudicated a bankrupt. If I am correct as to the effect the injunction on the power of the directors, no act of bankruptcy has been committed, as the commencement of the

equity suit and the appointment of the receivers, and their possession of the property, under the case cited, was not such an act.

## Public Service Corporations.

Are public service corporations of this class, and engaged in the business described, subject to the bankruptcy law? May they be adjudicated bankrupts? The act itself is silent on the subject. But it does say that those companies, and those only, engaged principally in "manufacturing," in "trading," in "printing," in "publishing," in "mining," and in "mercantile pursuits," may be adjudicated bankrupts. It is difficult to point out a public service corporation, or quasi public service corporation, engaged in trading, printing, publishing, mining, or a mercantile pursuit, and organized under any law authorizing it to do business intended for the service of the public. A corporation organized to make gas, and authorized by law to transport it by gas mains and pipe lines to consumers, and given the right of eminent domain, and to occupy public streets and avenues in a way, and any similar corporation, ought to be held a transportation corporation pure and simple, and its principal business that of transportation, without splitting hairs as to the cost of making the gas and the cost of transporting and delivering it.

There was a serious and wide difference of opinion in the committee on the judiciary and in the Congress itself whether corporations, any corporation, should be brought under the operation of the law. There was a feeling on the part of some that railroad corporations should be included, if any were. But when it was considered that railroads are the arteries of commerce and transportation, state and interstate, created by state laws in the main, and extending with their connecting lines from state to state and Lakes to Gulf under merger and consolidation agreements, it was seen that, to properly administer the property of such corporations in the bankruptcy courts and under a bankruptcy law, it would be necessary to make many special and extraordinary provisions for those cases, if the public service was to be considered and the interests of the public conserved. The idea was abandoned. So of many other corporations.

Let us suppose that these eight public service corporations lay on the border of two judicial districts, some in the one and some in the other, and that they are subject to the bankruptcy law. Who can point out a mode of administration under the present law that would be efficient and preserve and protect the rights of the general public? In this case, if the affairs of the Hudson River Power Company, which generates the main portion of the electrical power used, outside of the Utica and Oneida plants, connection by transmission lines contemplated not having been made when financial difficulties arose, are to be administered by one court, and those of the other companies by another, interminable differences and litigations will intervene, and the public, now served by it and the others operated in harmony as it was intended they should be, will suffer. Must not the rights and interests of private creditors sometimes be subordinated to the public interests? It is not necessary for me to decide this question in these cases, or in any one

of them, as they have all been disposed of on other satisfactory grounds.

However, it may not be amiss to call attention to the authorities on the question, which, to say the least, ought to have weight in these cases. In re Bay City Irrigation Co. (D. C.) 135 Fed. 850; In re H. R. Leighton & Co. (D. C.) 147 Fed. 311. See language of Collier on Bankruptcy (5th Ed.) 64. His opinion is that:

"All business corporations, as distinguished from public, quasi public, money saving, or lending corporations, shall be amenable to the act."

In Re Bay City Irrigation Co., supra, it was expressly held by the referee, and approved by the judge, that:

"A quasi public corporation, engaged in furnishing water for irrigation purposes, clothed with the right of eminent domain, and subject to statutory restrictions on such power, is not amenable to the federal bankruptcy act, on the ground of public policy."

Of course the case was correctly decided on the ground it was not engaged in manufacturing, trading, or mercantile pursuits.

As to the objection made that the Schenectady Trust Company is not a creditor in those cases where it has interposed an answer, I hold that it is a creditor, and had the right to answer. I do not doubt the right of the receivers representing these corporations, and all the creditors and their interests, to raise and present this question. In fact, it was their duty to do so. Can it be possible that these receivers were powerless to oppose or prevent these adjudications, if not warranted by law, assuming the general creditors preferred an administration of the several corporate properties by the court in bankruptcy? They were officers of the Circuit Court, which had taken jurisdiction and possession, with ample equity power, and they had the right and duty to see that its jurisdiction was not improperly ousted, and the property taken from the custody of that court illegally or without warrant of law. The order of the Circuit Court appointing them, in express terms, commanded them "to operate and manage its plants, and to exercise its authority and franchises, * * * and to preserve the said property, * * * and to protect the title and possession of the same," etc. I do not think this order in conflict with the bankruptcy act, or that any strained construction of that act can or should nullify it. Unless that order of the Circuit Court is a nullity, the receivers had power to oppose the adjudications prayed for. They represent the corporations, and exercise their franchises and functions. For the purpose of opposing adjudication, they were the alleged bankrupt, and acted for it and in its name.

It should further be remarked that the burden was on the petitioners in all the cases to show by a fair preponderance of evidence that the corporation was principally engaged in the business mentioned in the petitions respectively. Philpot v. O'Brion, 11 Am. Bankr. Rep. 205, 126 Fed. 167, 61 C. C. A. 111; Collier on Bankruptcy (6th Ed.) 110. This has not been done in either case.

It follows that adjudications are denied, and the petition in each case is dismissed. There will be orders accordingly.

Supplemental Memorandum, Amending Opinion as Applicable to Hudson River Power Transmission Company, Alleged Bankrupt.

Since deciding the above cases and filing opinion therein, my attention has been called to the following evidence, and statement appearing in the evidence given on the hearing as to the Hudson River Power Transmission Company (page 27):

"Q. Have you physical possession of the orders or the requisitions? A. I have copies of the originals here, I guess. Q. Will you produce them?

"Mr. Todd: We want to show the entire transaction. As I understand it, it was this way: Mr. Tinker or Mr. Morrow was in charge of the Mechanicsville plant, and when they wanted any supplies or materials they made a requisition upon the purchasing agent, Mr. Peddrick, or the Hudson River Electric Power Company, whichever you want to term it, for such things as they wanted. Thereupon Mr. Peddrick ordered these materials or supplies from some concern, and in pursuance of these orders sent out by Mr. Peddrick as purchasing agent they were supplied, and were finally sent to the Hudson River Power Transmission Company. What we want to show is the course of business by which these supplies were asked for by some one in charge of the Hudson River Power Transmission Company's plant, and afterwards were supplied to them.

"Mr. Rose: That is all right. They are all here."

The copies of the orders given have also been presented to me for inspection. These copies were put in evidence, for the reason that the petitioning creditors did not produce the original orders, which they admitted, or did not deny, having. To illustrate: In the printed record the orders appear to show that they were signed, "Hudson River Electric Power Co., Purchasing Agent." See page 44, order of May 26, 1908. Such was not the fact. The original orders, it is evident, were signed, "Hudson River Electric Power Company, C. H. Peddrick, Purchasing Agent." Peddrick was the purchasing agent of the Hudson River Electric Power Company, the controlling company.

It is therefore clear that the orders were given by Peddrick, as purchasing agent of, and for, the Hudson River Electric Power Company, and that such company was the principal in the transaction. The confusion in the mind of the court arose from the fact that the briefs did not call attention to this situation. The copies of the orders themselves were not before the court, and the record was so printed as to mislead.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes